**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

----------------------------------------------------------------- x
                                                     :

In re Application of CHEVRON CORPORATION for   :
an Order Pursuant to 28 U.S.C. § 1782 to Conduct   :   Case No. _____
Discovery for Use in Foreign Proceedings.           :
                                                     :

----------------------------------------------------------------- x

**MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR AN
ORDER PURSUANT TO 28 U.S.C. § 1782 FOR EXPEDITED SERVICE AND EN-
FORCEMENT OF SUBPOENA FOR USE IN FOREIGN PROCEEDINGS**

Arthur Makadon (Pa. I.D. No. 17104)
Burt M. Rublin (Pa. I.D. No. 32444)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: 215.665.8500
Facsimile: 215.864.8999

OF COUNSEL:
Randy M. Mastro
Scott A. Edelman
Andrea E. Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Applicant Chevron Corporation*

# TABLE OF CONTENTS

Page

I. INTRODUCTION ....................................................................................................... 1

    A.    The Discovery Chevron Seeks .......................................................... 4

    B.    The Urgent Need for the Discovery .................................................. 6

II. FACTUAL BACKGROUND ...................................................................................... 8

    A.    TexPet's Participation in State-Controlled Oil Operations in
             Ecuador, the Passage of the Environmental Management Act,
             and the Filing of the Lago Agrio Litigation and Treaty
             Arbitration ........................................................................................ 8

    B.    Plaintiffs' Fraudulent and Collusive Conduct in the Lago Agrio
             Litigation ........................................................................................ 10

             1.    Plaintiffs' False Judicial Inspection Expert Report ................... 10

             2.    Cabrera's Supposedly Impartial and Independent
                     Report ........................................................................................ 11

             3.    Cabrera and Plaintiffs' Undeniable Collusion ........................... 13

    C.    Kohn's Role in Connection with the Lago Agrio Litigation ............... 16

             1.    Kohn's Support for the Plaintiffs in the Lago Agrio
                     Litigation ................................................................................... 16

             2.    Kohn's Support for Plaintiff-Affiliated Organizations ............... 19

             3.    Kohn's Knowledge Concerning Other Conduct ........................ 22

III. SECTION 1782 ENTITLES CHEVRON TO DISCOVERY ................................. 23

    A.    Chevron's Requested Discovery is Highly Relevant and
             Presumptively Discoverable Under Section 1782 ............................. 23

    B.    Discovery Requested by Chevron Meets the Statutory
             Requirements of Section 1782 ......................................................... 25

              1.    The Parties To Be Subpoenaed Are Residents of This
                     District ...................................................................................... 25

              2.    The Discovery Sought Is for Use in Foreign Tribunals ............. 25

**Table of Contents**
**(Continued)**

Page

3.  Chevron Is an "Interested Person" ............................................................. 26

C.  The Discovery Does Not Seek Disclosure of Privileged
Materials .................................................................................................................... 26

D.  Discretionary Factors Strongly Militate In Favor Of Allowing
The Requested Discovery ...................................................................................... 31

1.  Discovery Requested by Chevron is Appropriately
Focused ............................................................................................................ 31

2.  Kohn and His Law Firm Are Not Parties to the Lago
Agrio Litigation or the Treaty Arbitration .................................................... 32

3.  Ecuadorian Courts and UNCITRAL Arbitral Panels
Historically Have Been Receptive To Federal Court
Assistance Under Section 1782 ..................................................................... 32

4.  This Application Seeks Probative And Relevant
Evidence For Two Foreign Proceedings, And In No
Way Circumvents Foreign Proof-Gathering Restrictions......................... 33

IV. CONCLUSION ............................................................................................................. 34

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Amobi v. D.C. Dep't of Corr.*,
  262 F.R.D. 45 (D.D.C. 2009) ........................................................................26

*Comision Ejecutiva Hidroelectrica del Rio Lempa v. Nejapa Power Co., LLC*,
  No. 08-135-GMS, 2008 WL 4809035 (D. Del. Oct. 14, 2008)........................26

*Edgar v. K.L.*,
  93 F.3d 256 (7th Cir. 1996) ...........................................................................24

*G.K. Las Vegas Ltd. P'ship v. Simon Prop. Group*,
  Case No. CV-S-04-1199 DAE-GWF, 2009 U.S. Dist. LEXIS 111034
  (D. Nev. Nov. 30, 2009) ................................................................................24

*In re Application of Babcock Borsig AG*,
  583 F. Supp. 2d 233 (D. Mass. 2008) .............................................................32

*In re Application of Chevron Corp.*,
  709 F. Supp. 2d 283 (S.D.N.Y. 2010) ..........................................3, 8, 9, 25, 33

*In re Application of Strand Invs. Ltd.*,
  Case No. 09-21985-CIV-MORENO, 2009 U.S. Dist. LEXIS 76445
  (S.D. Fla. July 24, 2009)................................................................................26

*In re Bayer AG*,
  146 F.3d 188 (3d Cir. 1998) ......................................................................24, 32

*In re Compania Chilena de Navegacion Interoceanica S.A.*,
  Case No. 03 CV 5382 (ERK), 2004 U.S. Dist. LEXIS 6408
  (E.D.N.Y. Jan. 29, 2004) ...............................................................................32

*In re Grand Jury Investigation*,
  631 F.2d 17 (3d Cir. 1980) .............................................................................27

*In re Grand Jury Matter*,
  926 F.2d 348 (4th Cir. 1991) ..........................................................................27

*In re Grand Jury Subpoena*,
  223 F.3d 213 (3d Cir. 2000) ...........................................................................30

*In re Hechinger Inv. Co. of Del., Inc.*,
  303 B.R. 18 (D. Del. 2003)..............................................................................28

*In re Heraeus Kulzer, GmbH*,
  No. 09-MC-00017, 2009 WL 2981921 (E.D. Pa. Sept. 11, 2009) ...................31

**Table of Authorities**
**(continued)**

Page(s)

*In re Merck & Co.,*
  197 F.R.D. 267 (M.D.N.C. 2000) ................................................................26

*In re Noboa,*
  Nos. M18-302, M19-111, 1995 U.S. Dist. LEXIS 14402
  (S.D.N.Y. Oct. 3, 1995) ..........................................................................32

*In re Oxus Gold PLC,*
  Case No. MISC 06-82-GEB, 2007 U.S. Dist. LEXIS 24061
  (D.N.J. Apr. 2, 2007) .................................................................26, 31, 32

*In re Roz Trading Ltd.,*
  Case No. 1:06-cv-02305-WSD, 2007 U.S. Dist. LEXIS 2112
  (N.D. Ga. Jan. 11, 2007) .........................................................................32

*In re Silicone Gel Breast Implants Prods. Liab. Litig.* (MDL926),
  Case No. CV 92-P-10000-S, 1999 U.S. Dist. LEXIS 23526
  (N.D. Ala. Apr. 25, 1999) .......................................................................24

*In re Teleglobe Comm's Corp.,*
  493 F.3d 345 (3d Cir. 2009) ...............................................................27, 28

*Intel Corp. v. Advanced Micro Devices, Inc.,*
  542 U.S. 241 (2004)..........................................................6, 25, 31, 32, 33

*Minatec Fin. S.A.R.L. v. SI Group Inc.,*
  No. 1:08-CV-269 (LEK/RFT), 2008 U.S. Dist. LEXIS 63802
  (N.D.N.Y Aug. 18, 2008) ........................................................................33

*Quinn Constr., Inc. v. Skanska USA Bldg., Inc.,*
  263 F.R.D. 190 (E.D. Pa. 2009)................................................................29

*Republic of Ecuador v. ChevronTexaco Corp.,*
  376 F. Supp. 2d 334 (S.D.N.Y. 2005) ........................................................8

*Ukrnafta v. Carpatsky Petroleum Corp.,*
  Case No. 3:09-MC-265 (JBA), 2009 U.S. Dist. LEXIS 109492
  (D. Conn. Aug. 27, 2009) ........................................................................33

*Weber v. Finker,*
  554 F.3d 1379 (11th Cir. 2009) ...............................................................33

*Westinghouse v. Republic of the Philippines,*
  951 F.2d 1414 (3d Cir. 1991) ..................................................................28

**Table of Authorities**
**(continued)**

Page(s)

**Statutes**

28 U.S.C. § 1782.................................................................................................. passim

**Rules**

Arbitration Rules of the United Nations Commission on International Trade Law,
  Article 24 (Dec. 15, 1976) ..................................................................................34

**Other Authorities**

Judith Kimerling, *Indigenous Peoples and the Oil Frontier in Amazonia:  The
  Case of Ecuador, ChevronTexaco, and Aguinda v. Texaco*, 38 N.Y.U. J.
  INT'L L. & POL. 413, 519 n.290 (2006). ..........................................................10

*Petroecuador diagnostica los daños ambientales pro crudo*, EL UNIVERSO
  (Feb. 28, 2009)....................................................................................................8

## I.   INTRODUCTION

28 U.S.C. § 1782 ("Section 1782") authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . ." Pursuant to Section 1782, Applicant Chevron Corporation ("Chevron") respectfully applies to this Court for an order authorizing the service of subpoenas to obtain documents and deposition testimony from respondents Joseph C. Kohn, a lawyer in this District, and his law firm, Kohn, Swift & Graf, P.C. (collectively, "Kohn"), and for an order establishing an expedited briefing schedule for any objections or motion to quash the subpoenas.  Chevron seeks this discovery for use in two pending foreign proceedings in which Chevron is a party: (1) a suit captioned *Maria Aguinda y Otros v. Chevron Corporation*, filed against Chevron in 2003 in the Provincial Court of Justice of Sucumbíos in Nueva Loja, Ecuador (the "Lago Agrio Litigation"); and (2) an international arbitration brought by Chevron and Texaco Petroleum Company ("TexPet") against the Republic of Ecuador ("ROE"), filed on September 23, 2009, under the Bilateral Investment Treaty between the United States and Ecuador (the "Treaty Arbitration") (together, the "Foreign Proceedings").  As demonstrated below, evidence recently produced in other proceedings indicates that Kohn is very likely to have information concerning significant fraud and collusion in these Foreign Proceedings.

The Foreign Proceedings concern claims that Chevron is liable for environmental and other damages associated with TexPet's involvement in an oil exploration and production consortium with the ROE's state oil company, Petroecuador, in the Oriente region of Ecuador, between 1964 and 1992.  These claims stand in stark contrast to the facts.  TexPet completed a multi-million dollar remediation effort under the monitoring and supervision of both Petroecuador and the Ecuadorian Government, and TexPet received a full and complete release of liability

1

for environmental impact from the ROE. *See infra*, § II.A. Since the ROE terminated TexPet's concession and gave Petroecuador sole control over operations in 1990, Petroecuador has significantly expanded its operations in the former concession area, compiling an abysmal environmental record. *Id.* Seeking to shift the ROE's own environmental liability to Chevron, the ROE has been colluding with the Plaintiffs in the Lago Agrio Litigation ("Plaintiffs") to impose a grossly improper multi-billion dollar "damages" award against Chevron. *See infra*, § II.B. The scope of the improper conduct is broad, including falsified expert reports, trumped-up criminal charges against Chevron lawyers, and efforts to intimidate the Lago Agrio court with a private "army." One key aspect of the fraud and collusion is Plaintiffs' introduction of a fabricated **$27.3 billion** damages report falsely presented as the work of an "independent" court expert, even though it was actually prepared by consultants reporting to Plaintiffs' representatives. As evidence began to mount that Plaintiffs' representatives ghost wrote the supposedly independent report, Plaintiffs submitted additional expert reports now seeking up to **$113 billion**.

As of the date of this Application, **eleven other federal district courts** in New York, Georgia, Colorado, Texas, New Jersey, California, Tennessee, North Carolina, New Mexico, and the District of Columbia have uniformly allowed Chevron to seek discovery under Section 1782 from Plaintiffs' counsel and consultants in connection with the Foreign Proceedings, and the Second and Fifth Circuits have already affirmed two of these decisions.[1] The fact that some of

---

[1] *See* Request for Judicial Notice of U.S. Filings ("U.S. RJN"), Ex. L (Order, *In re Applic. of Chevron Corp.*, No. M-19-111 (S.D.N.Y. Aug. 6, 2010) (granting Chevron's application seeking discovery from Steven Donziger, an attorney providing various services for the Lago Agrio Plaintiffs)); U.S. RJN Ex. U (Summary Order, *In re Applic. of Chevron Corp.*, No. 10-mc-0002-LAK (S.D.N.Y. Oct. 20, 2010) (denying Donziger's motion to quash premised on arguments of privilege and unduly burdensome discovery requests); U.S. RJN Ex. Y (Opinion and Order, *In re Applic. of Chevron Corp.*, No. 10-mc-0002-LAK (S.D.N.Y. Nov. 5,

[Footnote continued on next page]

Plaintiffs' representatives are also attorneys has not shielded them from discovery into this fraudulent and collusive conduct.  Indeed, on October 20, 2010, the United States District Court for the Southern District of New York denied a motion to quash a subpoena made by an attorney who is one of the leaders of Plaintiffs' efforts in the Lago Agrio Litigation, ordering him to appear for deposition to explain his contact with the Special Master appointed by the Lago Agrio

-----------------------------

[Footnote continued from previous page]

2010) (same, in more detailed opinion following Oct. 20 summary order); U.S. RJN Ex. I, at 13 (*In re Applic. of Chevron Corp.*, No. 1:10-mc-00371 (D.D.C. July 22, 2010) (granting Chevron's application seeking discovery from Alberto Wray, <u>former counsel</u> for Plaintiffs in the Lago Agrio Litigation)); U.S. RJN Ex. V (*In re Applic. of Chevron Corp.*, No. 10-mc-00371-CKK-DAR (D.D.C.) (affirming the Magistrate's order attached as U.S. RJN Ex. I, and granting Chevron discovery of the Lago Agrio Plaintiffs' <u>former counsel</u> and advocate Alberto Wray)); *In re Application of Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y. 2010) (*Berlinger I*) (granting Chevron's application seeking discovery from Joseph Berlinger, producer of the movie *Crude*), *aff'd* U.S. RJN Ex. H (*Chevron Corp. v. Berlinger*, Nos. 10-1918-cv, 10-1966-cv (2d Cir. July 15, 2010)); U.S. RJN Ex. E (*In re Applic. of Chevron Corp.*, Case No. 4:10-mc-134 (S.D. Tex. Apr. 5, 2010) (granting Chevron's application seeking discovery from 3TM Consulting, LLC, an environmental consulting firm retained by counsel for Plaintiffs)), *aff'd* U.S. RJN Ex. D (*Ecuadorian Plaintiffs v. Chevron Corp.*, No. 10-20389 (5th Cir. Sept. 8, 2010)); U.S. RJN Ex. B (Order, *In re Applic. of Chevron Corp.*, No. 1:10-mi-00076 (N.D. Ga. Mar. 2, 2010) (granting Chevron's § 1782 application seeking discovery from Dr. Charles Calmbacher, one of Plaintiffs' judicial inspection experts)); U.S. RJN Ex. C (Order, *Chevron v. Stratus Consulting, Inc.*, et al., Case No. 10-cv00047 (D. Co. March 4, 2010) (granting Chevron's application seeking discovery from Stratus Consulting, an environmental consulting firm retained by Plaintiffs' counsel)); U.S. RJN Ex. G (*In re Applic. of Chevron Corp*, No. 10-cv-01146-IEG-WMC (S.D. Cal. Sept. 10, 2010) (affirming Magistrate Judge's order granting Chevron's application seeking discovery from E-Tech, Inc., another of Plaintiffs' environmental consultants)); U.S. RJN Ex. F, at 47 (Hearing, *In re Applic. of Chevron Corp.*, No. 2:10-cv-02675 (D.N.J. June 11, 2010) (granting Chevron's application seeking discovery from Uhl, Baron, Rana & Associates, a firm retained by Plaintiffs' counsel); U.S. RJN Ex. Q (Order, *In re Applic. of Chevron Corp.*, No. 3:10-cv-0686 (M.D. Tenn. Aug. 17, 2010) (granting Chevron's application seeking discovery from Mark Quarles, a one of Plaintiffs' paid consultants)); U.S. RJN Ex. N (Order, *In re Applic. of Chevron Corp.*, No. 1:10-mc-00027 (W.D.N.C. Aug. 30, 2010) (granting Chevron's application seeking discovery from Charles Champ, one of Plaintiffs' paid consultants, ordering production of documents in five days and a deposition in twelve days)); U.S. RJN Ex. M (Order, *In re Applic. of Chevron Corp.*, No. 10-mc-00021-JCH/LFG (D.N.M. Sept. 1, 2010) (granting Chevron's application seeking discovery from Richard A. Kamp and E-Tech International, Plaintiffs' consultants, and ordering production of documents and deposition by September 8, 2010)).

court and finding strong evidence that the attorney with others had written "some or all of the expert's final report . . . supposedly as the neutral product of the expert." U.S. RJN Ex. U; U.S. RJN Ex. Y.

## A.     The Discovery Chevron Seeks

Richard Stalin Cabrera Vega ("Cabrera"), a Special Master, submitted a $27.3 <u>billion</u> damage report to the court in the Lago Agrio Litigation, claiming that the report was his own "independent" and "impartial" work, as the Ecuadorian court required. But the Cabrera Report was neither independent nor impartial; instead, it was drafted by environmental consultants hired by and reporting to Plaintiffs' representatives. After reviewing some of the evidence Chevron has already obtained regarding the conduct of Plaintiffs' counsel, Magistrate Judge Howell of the Western District of North Carolina ruled:

> While this court is unfamiliar with the practices of the Ecuadorian judicial system, the court must believe that the concept of fraud is universal, and that what has bla-tantly occurred in this matter would in fact be considered fraud by any court.

U.S. RJN Ex. N, at 12 (*In re Applic. of Chevron Corp.*, No. 1:10-mc-00027 (W.D.N.C. Aug. 30, 2010)). Chevron seeks discovery from Kohn relating to this conduct.

There is substantial evidence that Kohn provided financial and other support to the Plain-tiffs in the Lago Agrio Litigation. In a movie that Plaintiffs caused to be made about the Lago Agrio Litigation, *Crude*, Steven Donziger[2] introduces Kohn as: "Joe Kohn, whose law firm is providing the financial support that allows this case to happen." Declaration of Scott A. Edel-man ("Decl."), Ex. C. Donziger also described Kohn as a "de facto partner," saying that "he's

---

[2] Donziger is a lawyer, but the Southern District of New York has observed that his "role in connection with events in Ecuador has been at least primarily in capacities other than that of an attorney" and "Donziger's role at least in major respects is that of a political operative, not a lawyer." U.S. RJN Ex. U at 6.

the one that's behind this whole thing." Decl. Ex. A, B (CRS169-04-CLIP-01).  As an editorial in the *Wall Street Journal* recently observed, Kohn "told the makers of 'Crude' that 'a lot of my motivation is, at the end of the day, is that it will be a lucrative case for the firm.'"  Decl. Ex. D ("Shakedown in the Rain Forest," *Wall Street Journal*, Sept. 24, 2010), quoting *Crude*.

Evidence recently obtained by Chevron also shows that Kohn has information concerning financial support to, and reports from, the environmental consultants who ghost wrote the Cabrera Report.  Outtakes from *Crude*—recently produced in another 1782 proceeding—show Donziger and Kohn on January 31, 2007 discussing the expected appointment of Cabrera by the court (as a supposedly independent special master).  Kohn states: "But our people would do the basic work and give it to this guy, because he's not going to do the actual study."  Decl. Ex. A, B (CRS169-05-CLIP-01).  Donziger replies: "Exactly.  It would be our team, that we would pay, that would do whatever field work we would want."  *Id.*  The *Crude* outtakes also show a secret meeting in Ecuador a little over a month later, on March 3, 2007, at which Plaintiffs' counsel, Plaintiffs' consultants, and Cabrera plan Cabrera's "global expert investigation" and his report. *Id.* (CRS-187-01-02-CLIP-01; CRS-187-01-02-CLIP-02; CRS-187-01-02-CLIP-12).  Four days later, on March 7, 2007, Plaintiffs' environmental consultants sent a memorandum to Kohn detailing the work they planned to conduct to prepare the global expert investigation and providing a budget to complete that work.  Decl. Ex. E.  Less than two weeks later, the Lago Agrio court appointed Cabrera as the court's supposedly independent Special Master.  Request for Judicial Notice of Court Filings and Orders in the Lago Agrio Litigation and of Provisions of Ecuadorian Law ("Ecuador RJN"), Ex A.  Other documents obtained by Chevron through 1782 proceedings confirm Kohn's extensive knowledge concerning financial support and supervision of the effort by Plaintiffs' consultants to ghost write the Cabrera Report, as well as to conduct a so-called

"peer review" of the report that they wrote in Cabrera's name. *See infra,* § II.C.

Chevron is entitled to discovery to uncover information in Kohn's possession, custody, or control concerning this fraudulent and collusive scheme. This Application satisfies each of Section 1782's statutory prerequisites for each of the two foreign proceedings at issue: (1) Respondents "reside" or may be "found" in this District; (2) the discovery sought by Chevron is "for use in" foreign or international proceedings; and (3) Chevron is an "interested person" in those proceedings. *See Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 256-59 (2004).

Further, the discretionary factors a court considers in determining whether to grant a Section 1782 request also overwhelmingly favor granting this Application: (1) Kohn is not a participant in the foreign proceedings; (2) Ecuadorian courts and arbitral tribunals historically have been receptive to Section 1782 assistance from federal courts; (3) this Application does not constitute an attempt to circumvent foreign proof-gathering restrictions, but rather is a good faith effort to obtain probative evidence of fraud; and (4) the discovery sought is not unduly intrusive, burdensome, or protected by privilege. *See Intel,* 542 U.S. at 264-65.

## B.    The Urgent Need for the Discovery

Chevron has an urgent need for the discovery sought. The Treaty Arbitration is proceeding quickly, with a jurisdictional hearing to take place the week of November 22, 2010. Chevron must also respond to new expert reports submitted by the Lago Agrio Plaintiffs on September 16, 2010, which claim $113 billion in "damages." U.S. RJN Ex. U, at 1. Further, in light of Plaintiffs' pressing for a speedy resolution of the case, the very real possibility exists that a judgment could be entered in the near future. Chevron needs to submit or proffer further evidence of fraud and collusion in both tribunals before that occurs. Moreover, the individual applicants who are defending against sham criminal charges in Ecuador have a preliminary hearing scheduled for January 5, 2011. *See Application of Rodrigo Pérez Pallares and Ricardo Reis Veiga* (concur-

rently filed).  Other federal courts to consider the matter have recognized the urgency.  *See, e.g.*, U.S. RJN Ex. U, 2 (finding on October 20, 2010 that "the Lago Agrio plaintiffs are seeking to move the Ecuadorian civil litigation to judgment as quickly as possible" and thus "petitioners have an urgent need for any discovery to which they are entitled here"); U.S. RJN Ex. Y, 4 (subsequently holding on November 5, 2010, that the Plaintiffs "have forced this and other courts to choose between conducting expedited proceedings or depriving Chevron and the Individual Petitioners of meaningful opportunities to obtain relief here").

Given the urgency of this request, Chevron asks this Court to enter an Order to Show Cause setting an abbreviated briefing schedule on both the application and any objections or motions directed to the subpoenas.[3]  The issues involved in this application, and Plaintiffs' likely objections to the discovery sought, have been fully briefed by the Plaintiffs and Chevron in multiple courts.  Chevron proposes that Kohn and Plaintiffs be granted six court days from the issuance of the Order to Show Cause to submit any objection or motion to quash the subpoena and/or Section 1782 application, that Chevron receive two court days for its reply, and that, if the Court wishes a hearing, that it be held immediately after Chevron files its reply.  Other federal courts have adopted similarly expedited briefing schedules.  For example, the District of Vermont recently adopted a similarly expedited schedule in connection with a related 1782 Application for discovery filed by Chevron.  *See, e.g.*, U.S. RJN Ex. W (October 22, 2010 Order to Show Cause); *see also, e.g.*, U.S. RJN Ex. X (August 20, 2010 Order to Show Cause setting similarly expedited schedule).  Moreover, given the nature of the fraud, Chevron also asks the Court to put

---

3  Chevron has submitted proposed orders granting this Application and a proposed Order to Show Cause ordering an accelerated briefing and hearing schedule as to both the application and any objections or motion directed to the subpoena.

in place whatever requirements, procedures, or protocols may be necessary to preserve the important evidence Chevron seeks during the pendency of this Application.

## II.    FACTUAL BACKGROUND

### A.    TexPet's Participation in State-Controlled Oil Operations in Ecuador, the Passage of the Environmental Management Act, and the Filing of the Lago Agrio Litigation and Treaty Arbitration

From 1964 to 1992, TexPet participated in an oil exploration and production consortium in the Oriente region of Ecuador. *See Republic of Ecuador v. ChevronTexaco Corp.* ("*ROE*"), 376 F. Supp. 2d 334, 339-40 (S.D.N.Y. 2005). Petroecuador, Ecuador's state-owned oil company, became a stakeholder in the consortium in 1973 and in 1977 became the 62.5% majority stakeholder. *Id.* at 340. From 1990 to the present, Petroecuador has been the *sole* operator, and from 1992 to the present, the *sole* owner, of exploration and production operations in the former concession area, *id.* at 340-41, amassing an abysmal environmental record. Decl. Ex. F, 6. Media sources report that between 2000 and 2008, Petroecuador was responsible for more than 1,400 separate spills in the former Concession area. *See Petroecuador diagnostica los daños ambientales por crudo*, EL UNIVERSO (Feb. 28, 2009).

When the concession contract expired in 1992, TexPet negotiated a settlement agreement (the "1995 Agreement") with Ecuador and agreed to remediate certain of the consortium's oil exploration and production areas. *See ROE*, 376 F. Supp. 2d at 341-42; *Berlinger I*, 709 F. Supp. 2d at 286; Decl. Ex. F, 4-6. TexPet spent $40 million to complete its remediation under the monitoring and supervision of Petroecuador, the Ecuadorian government, and environmental consultants, and pursuant to the 1995 Agreement and a 1998 release agreement (the "1998 Release"), which "encompassed 'all the Government's and Petroecuador's claims against the Releases for Environmental Impact from the Operations of the Consortium[.]'" *See Berlinger I*, 709 F. Supp. 2d at 286 (quoting *ROE*, 376 F. Supp. 2d at 341); Decl. Ex. F., 3; Decl. Ex. G, 5-6.

After TexPet's 1998 release, Plaintiffs' U.S. and Ecuadorian lawyers successfully sought enactment of a new law, which for the first time granted standing to *private parties* to seek compensation in Ecuador for generalized environmental damage—the same claims for damage that Ecuador had already settled vis-à-vis TexPet. *See* Decl. Ex. F, 6-8, Ex. H. The resulting law, the Environmental Management Act ("EMA"), was heralded by the legislature as "a historic step . . . in Ecuadorian law." Decl. Ex. I, 3.

Plaintiffs' representatives filed the Lago Agrio Litigation on behalf of 48 Ecuadorians in 2003, stating claims that are premised not upon personal injury, but rather upon the diffuse environmental rights created by the EMA in 1999, for which TexPet had already been fully released in 1998—one year *before* the creation of the EMA. Despite this inappropriate retroactive application of the EMA, Ecuador has vowed to provide its "full support" to Plaintiffs, Decl. Ex. J, and "announced that it would receive ninety percent of any recovery." *Berlinger I*, 709 F. Supp. 2d at 287. Plaintiffs' representatives have taken advantage of this vow, and have colluded with the Ecuadorian government to undermine the comprehensive release that TexPet received from the government in 1998, and to seek to hold Chevron liable for Petroecuador's obligations. The motivation is clear: in Donziger's words, "the government here will never pay for any judgment. In contrast, Texaco can pay." Decl. Ex. A, B (CRS116-01-CLIP-01).

Tellingly, the Lago Agrio Litigation was filed against Chevron—but not Petroecuador. *Berlinger I*, 709 F. Supp. 2d at 286-87. The Lago Agrio Plaintiffs' failure to name Ecuador's state-owned oil company, despite Petroecuador's sole ownership of production operations since 1992 and its abysmal environmental record, was not an oversight or accident. Instead, Plaintiffs' former counsel Cristóbal Bonifaz—who worked with Kohn since at least 1993 in connection with various litigation matters allegedly arising from TexPet's participation in the oil consor-

tium—has admitted to the existence of an agreement not to sue Petroecuador for any of the alleged environmental damage at issue in the Lago Agrio Litigation.  Judith Kimerling, *Indigenous Peoples and the Oil Frontier in Amazonia:  The Case of Ecuador, ChevronTexaco, and Aguinda v. Texaco*, 38 N.Y.U. J. INT'L L. & POL. 413, 519 n.290 (2006).  Indeed, Bonifaz reportedly obtained "legal documents" consisting of, at a minimum, "notarized affidavits" from Plaintiffs in which they agree not to attempt to hold Petroecuador or the ROE liable for any purported environmental impact they attribute to the former consortium's operations, despite the fact that Petroecuador was the majority owner of the consortium, and continues oil production activities in the region to this day.  *Id.*

**B.      Plaintiffs' Fraudulent and Collusive Conduct in the Lago Agrio Litigation**

Plaintiffs' representatives have engaged in a broad array of improper conduct in connection with the Lago Agrio Litigation, from submitting false expert reports to organizing trumped-up criminal charges and even discussing a scheme to intimidate the Lago Agrio court with a private army.

**1.      Plaintiffs' False Judicial Inspection Expert Report**

At the outset of the Lago Agrio Litigation, through a process known as judicial inspections, the court ordered experts nominated by Plaintiffs and Chevron to jointly investigate and report on the environmental conditions at 122 former Consortium oil production sites.  Ecuador RJN Ex. A.  The Ecuadorian court appointed a panel of neutral "Settling Experts" to resolve any conflicts between the conclusions of the party-appointed experts based on their respective judicial inspections.  Decl. Ex. F, 10.  This procedure did not go well for Plaintiffs, however.  The first—and only—time the Settling Experts issued a report was in February 2006 at pits located at a site named Sacha 53, and the Settling Experts agreed with Chevron's experts,

concluding the pits remediated by TexPet posed little risk to nearby residents and water supplies. *Id.* at 11.

Plaintiffs' lack of success with the Settling Experts occurred notwithstanding the fact that at least two of the expert reports submitted in that process were fraudulent. Earlier this year, at a deposition obtained through Section 1782 in the Northern District of Georgia, one of Plaintiffs' judicial inspection experts, Dr. Charles Calmbacher, testified that two reports submitted to the Ecuadorian court under his name were not authored or authorized by him and that their conclusions were fabricated: "I did not reach these conclusions and I did not write this report," Decl. Ex. N at 116:9-10, and "Q: So the conclusions in the expert report for Shushufindi 48 . . . to the extent they're presented to the Court as conclusions you reached, that presentation would be false, correct?  A. Correct," *id.* at 117:16-20.

### 2.    Cabrera's Supposedly Impartial and Independent Report

When Plaintiffs were forced to abandon the fraudulent Calmbacher reports, they already had a backup in the works—the fraudulent report of court expert Cabrera, which the Plaintiffs, the Lago Agrio court and the Republic of Ecuador have falsely held out as independent and neutral. Cabrera was appointed as the court's "global" and "neutral" expert on March 19, 2007. Ecuador RJN Ex. A, 2.  The stated purpose of the "global assessment" process was to have a neutral and independent expert assemble a similarly neutral and independent team, conduct the necessary field and laboratory research, and then submit a report to the Ecuadorian court identifying any relevant damages and attendant liability.  The Ecuadorian court appointed Cabrera as "an *auxiliary* to the Court" and required that he "perform his duties . . . with complete *impartiality* and *independence* vis-à-vis the parties" and "observe and ensure . . . the impartiality of his work, and the transparency of his activities."  Ecuador RJN Ex. B, 3 (emphases added); *id.*, Ex. E, 12. The Ecuadorian court similarly ordered that Cabrera's team be independent. *Id.*, Ex. E, 6 ("In

reference to the persons acting as assistants to the expert in the sampling and other work being performed by the expert, these must be independent from the two parties").

Cabrera repeatedly represented to the court in Ecuador that all his work was performed independently, impartially, transparently, and exclusively by him and his independent expert team: "*All the work done was planned, directed, and approved by me*, as the person responsible for the expert examination." Ecuador RJN Ex. C (emphasis added). Cabrera also represented: "I should clarify that *I do not have any relation or agreements with the plaintiff*, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs." *Id.*, Ex. D (emphasis added). Indeed, Cabrera represented unequivocally:

> The defendant's attorneys allege that the plaintiff is in 'close contact' with me, and that the plaintiff has provided me with technical information and support staff to assist with the expert examination. *This is untrue.* If I need any technical information in connection with this case, all I have to do is request it from this Court; *the idea that the plaintiffs would be helping me with that is unthinkable....* Worse still is the accusation of [Chevron's] attorneys that the conduct of the other technicians is a "decoy," a ploy to conceal preexisting information provided by the plaintiff that I allegedly will simply attach to my expert report. *I condemn this assertion because it has no basis and there is no evidence to support it*[.]

*Id.*, Ex. F, 3 (emphases added).[4]

The Cabrera Report, issued only a year after Cabrera was appointed as Special Master, purported to find "serious and widespread contamination" in the former concession area and assessed damages against Chevron of more than $16 billion. Ecuador RJN Ex. G, 27. In a clear charade, Plaintiffs submitted "comments" purporting to criticize "the Expert's work and conclu-

---

[4] Plaintiffs and their U.S.-based consultants also have denied or misrepresented their relationship with Cabrera in Section 1782 proceedings pending in other courts across the country. *See, e.g.*, U.S. RJN Ex. K, 2-3; *id.*, Ex. J, 13-18 (describing various misrepresentations before the Ecuadorian court, United States courts, the United States Congress, and federal regulators).

sions" as containing "omissions [that] are unjustly favorable to the [defendant][.]" *Id.*, Ex. H, 40.  In response to Plaintiffs' comments, Cabrera dramatically increased the damage estimate, ultimately asserting damages for the purported environmental, social, and cultural impacts of the oil production consortium of nearly $19 billion, to which he added another $8.4 billion for "unlawful profits," for a total of $27.3 billion. *Id.*, Ex. I, 53-54.

### 3. Cabrera and Plaintiffs' Undeniable Collusion

Cabrera's claims of independence were false.  Outtakes from *Crude* obtained by Chevron in another Section 1782 proceeding show Plaintiffs' representatives and consultants meeting ***with Cabrera*** to plan his expert report on March 3, 2007, two weeks ***before*** Cabrera's appointment as the court's global damages expert.  *See* Decl. Ex. A, B (CRS187-01-02-CLIP-01, CRS189-00-CLIP-01,   CRS189-00-CLIP-02,   CRS189-00-CLIP-03,   CRS191-00-CLIP-01, CRS191-00-CLIP-02, CRS192-00-CLIP01).  The footage also shows Plaintiffs' lead Ecuadorian lawyer, Pablo Fajardo, Cabrera, and several consultants conducting presentations explaining the "Plan for the Global Expert Examination," *i.e.*, their plan for carrying out the official duties that the court would select Cabrera to perform. *Id.* (CRS187-01-02-CLIP-02, CRS187-01-02-CLIP-12).  Although the cameramen attempt to avoid filming Cabrera, he is heard introducing himself at the beginning of the meeting, and he can be seen in the margins of the screen interacting with people at the meeting, observing the presentations, and taking notes. *Id.* (CRS187-01-02-CLIP-01, CRS189-00-CLIP-01, CRS191-00-CLIP-01).   The assembled group apparently already knows that Cabrera will be selected by the court as the "neutral" global expert; after Donziger proposes that he and the U.S. consultants form a "work committee" to present a "draft plan" for the global expert assessment, he says to Cabrera, "and Richard, of course, you really have to be comfortable with all that." *Id.* (CRS189-00-CLIP-02).

When the discussion turns to drafting Cabrera's report, Fajardo emphasizes that everyone

needs to contribute to the report, explaining: "And here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all will contribute to that report—in other words—you see . . . *the work isn't going to be the expert's. All of us bear the burden*." Decl. Ex. A, B (CRS191-00-CLIP-03)  One of the translators asks whether the final report is going to be prepared only by the expert.  Fajardo responds, "The point is, what the expert is going to do is state his criteria, alright? and sign [on/in] the report and review it [unintelligible]. But all of us, all together, have to contribute to that report." *Id.* ¶ 23, Ex. A, B (CRS191-00-CLIP-03).  One of Plaintiffs' consultants, Ann Maest, asks, "Together?" and Fajardo confirms.  Maest then states, "But not Chevron," to which everyone laughs.  *Id.*  The recording of the meeting ends with Donziger discussing the ways to make Chevron pay more, and he comments, "We could jack this thing up to $30 billion . . . in one day." *Id.* (CRS189-00-CLIP-02).

In footage taped the following day (March 4, 2007), Donziger is shown at a lunch meeting with three of Plaintiffs' consultants.  Decl. Ex. A, B (CRS198-00-CLIP-00).  During the March 4 meeting, one of the consultants describes her plan for how the Plaintiffs and their consultants would conduct Cabrera's global examination.  *Id.* (CRS196-00-CLIP-01, CRS-198-00-CLIP-00, CRS195-05-CLIP01).  Another consultant states, "I know we have to be totally transparent with Chevron in showing them what we're doing."  Donziger answers, "No, no," and explains, "[b]ecause they will find out everything we do." *Id.* (CRS196-00-CLIP-01).  He goes on to say that "[o]ur goal is that they don't know shit . . . and that's why they're so panicked." *Id.* The third consultant comments to Donziger, "Having the perito [Cabrera] there yesterday in retrospect . . . that was bizarre." *Id.*  Donziger looks at him for about two or three seconds.  He then instructs: "Don't talk about it," and tells the camera crew, "And that is off the record." *Id.*

14

Later during the meeting, one of the consultants tells Donziger that they need evidence of groundwater contamination because Plaintiffs did not submit any and "right now all the reports are saying it's just at the pits and the stations and nothing has spread anywhere at all." Decl. Ex. A, B (CRS195-05-CLIP-01). In response, Donziger says:

> Hold on a second, you know, this is Ecuador. . . . You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want. Sorry, but it's true. . . . Therefore, if we take our existing evidence on groundwater contamination, which admittedly is right below the source . . . [a]nd wanted to extrapolate based on nothing other than our, um, theory," then "[w]e can do it. And we can get money for it.

*Id.* ***"Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit. It really is. We have enough, to get money, to win."*** *Id.* One of the consultants then states that "there is not enough information on that groundwater." *Id.* Donziger ultimately breaks off the discussion, stating, "There's another point I got to make . . . with these guys, but I can't get this on camera," and the footage ends. *Id.*[5]

Their fraud discovered, the attorneys behind the Lago Agrio Litigation have now resorted to perpetrating yet another fraud. On September 16, 2010, a Plaintiff-requested deadline for filing "damage assessments" in the Lago Agrio Litigation, Plaintiffs filed a pleading claiming that the $27 billion damage assessment they ghostwrote for Cabrera was too low, and instead asserted as much as $113 billion in damages. *See* U.S. RJN., Ex. U, at 1.

---

[5] For additional details of this meeting and other video evidence of collusion between Cabrera and Plaintiffs, Chevron refers the Court to the Memorandum of Law Chevron submitted to the Southern District of New York on August 3, 2010, in support of a Motion for a Preservation Order in the Section 1782 proceeding pending before that court. *See* U.S. RJN Ex. J at 5-13.

**C.    Kohn's Role in Connection with the Lago Agrio Litigation**

**1.    Kohn's Support for the Plaintiffs in the Lago Agrio Litigation**

Kohn and Donziger openly discuss Kohn's financing of the Lago Agrio Litigation in *Crude*. Donziger introduces Kohn as "Joe Kohn, whose law firm is providing the financial support that allows this case to happen." Decl. Ex. C. Kohn explains his intention to profit from his investment in the Lago Agrio Litigation: "[A] lot of my motivation at the end of the day is that it will be a lucrative case for the firm . . . ." *Id.* In the *Crude* outtakes, Donziger states: "Joe has been funding this case for 13 years." Decl. Ex. A, B (CRS076-05-CLIP-01A). Indeed, Kohn says that the Lago Agrio Litigation "could be the largest fee-producing case the firm has ever had." *Id.* (CRS 170-00-CLIP-04).

Kohn has information concerning payments to, and reports from, the consultants who ghost wrote the Cabrera Report, starting well before Cabrera was officially appointed by the court as the "perito," or global expert, on March 19, 2007.[6] Documents obtained by Chevron in other Section 1782 proceedings show that by April 2006—just two months after the Settling Report that agreed with Chevron and nearly a year <u>before</u> Cabrera was appointed—Kohn hired E-Tech International ("E-Tech") and other consultants to draft the global report. Decl. Ex. L (praising "the Kohn-Swift support for the lawsuit" as an "extraordinarily important commitment" and stating that the "focus of E-Tech's work over the coming months is the preparation of judicial annexes and conducting the peritaje global sampling program"), Ex. M (CA001002-05)

---

[6] *See, e.g.*, Decl. Ex. BB (Deposition Transcript of Douglas Beltman) at 21:7-11 ("Q. When was Stratus first retained to work on the Lago Agrio litigation? A. Sometime in mid-2007. Q. Who was Stratus retained by? A. Kohn Swift & Graf."); *id.* at 29:4-11 ("Q. Did Stratus take all its directions from Mr. Donziger? A. No. Q. Who – what other plaintiff attorneys did Stratus take directions from? A. Joe Kohn. Q. Anyone else? A. Not that I can recall.").

(May 26, 2006 status report from E-Tech to Joseph Kohn).  Recently produced handwritten notes, dated November 2006, from Ann Maest, one of the experts retained by Kohn, further confirm Kohn's financing of the preparation of the Cabrera Report.  Decl. Ex. FF (listing "Next steps" for writing the global assessment report, including "1. Finalize plan & budget  **2. talk to Joe about $**  3. train team  4. [scratched off] do sampling  5. write report") (emphasis added).

The *Crude* outtakes show that Donziger met with Kohn on January 31, 2007 to confirm Kohn's continuing financial support for Plaintiffs' consultants in connection with the Cabrera Report (Decl. Ex. A, B (CRS169-05-CLIP-01)), and Donziger met with Plaintiffs' consultants and Cabrera shortly thereafter, on March 3, 2007.  *See supra*, § II.B.2.  Four days later, on March 7, 2007, Plaintiffs' environmental consultants sent a memorandum to Kohn providing a budget and explaining what work remained to prepare the global expert investigation.  Decl. Ex. E.  In August 2007, Kohn executed a formal contract with Stratus Consulting pursuant to which Stratus would "prepar[e] a report on remediation costs for submittal to the court," "incorporating the work of other team members."  Decl. Ex. U, 6.  This "Prime Contract" served as the basis for continuing work, paid by Kohn, to draft Cabrera's report.  *See, e.g.*, Decl. Ex. O, 8 (subcontract signed February 25, 2008, referencing August 20, 2007 "Prime Contract" between Stratus Consulting, one of Plaintiffs' U.S. consultants, and Kohn Swift & Graf); Ex. V. (February 2008 email from Donziger copying Kohn and authorizing a budget for Stratus to "provid[e] technical assistance with the upcoming report, and provid[e] ongoing technical support for mediation."); Ex. CC (Email dated February 28, 2008 from Douglas Beltman to others on the Stratus team working on the Lago Agrio litigation assigning various parts of the Cabrera Report to each team member, including "The summary Peritaje Global report (~50 pages)"); Ex. BB (Beltman Dep. Tr.) at 194:11:21 ("So this would refer to the Spanish versions that we sent to plaintiff attorneys

got used almost straight as is by – used by Cabrera in his report"). Indeed in drafting the Cabrera Report, Stratus considered Joe Kohn "our real client." Decl. Ex. EE. Cabrera submitted the first report—including a 53 page global assessment—in April 2008, asserting $16 billion in supposed damages. Ecuador RJN Ex. G.

Kohn then financed continuing work by Plaintiffs' consultants. *See* Decl. Ex. X (e-mail from July 2008 authorizing work "to conduct technical analyses and prepare written materials for submittal to the Court re: the Cabrera report; Begin working on issues related to the response due in November"); Ex. W (authorizing work on revising Cabrera's cost estimates in October 2008). Cabrera submitted a revised report in November 2008, now asserting $27.3 billion in supposed damages. Ecuador RJN Ex. I. Kohn also funded a so-called "peer review" of the Cabrera Report, which Plaintiffs' consultants prepared in an effort to bolster the reports that Plaintiffs wrote for Cabrera. *See* Decl. Ex. Z (January 13, 2009 Memorandum from Stratus Consulting to Kohn and Donziger describing work through September 2008, including to "[c]oordinate peer review of Cabrera Report").

These documents show that Kohn has information not only about the financing of this activity, but also detailed aspects of Stratus's work on the Cabrera Report, including, for example, a request for approval to spend "an hour or two" responding to a question from Plaintiffs' public relations representative, Karen Hinton. Decl. Ex. X ("Doug  This will confirm our agreement for Stratus to proceed with the work outlined in your email of 6/29/08.  We have agreed that the estimates set forth are caps, and that you may not in fact bill up to that amount."), Ex. Y ("Doug  Thank you for your email.  Yes, it is fine with me to spend an hour or two responding to Karen's request"). The documents also show knowledge of the Plaintiffs' preparation of the Cabrera Report. Decl. Ex. DD (Email dated November 6, 2008 from Doug Beltman to Steven Donziger,

regarding reports prepared by Richard Clapp, stating, "A long while back, he wrote up a summary of the toxic effects of the chemicals in crude oil and drilling fluids, and it was incorporated into the expert report as an annex pretty much as is . . . I don't think we should hand out either one as Clapp's, thereby distributing proof.")  Based on the evidence Chevron has obtained thus far, it appears that Kohn is highly likely to have in his possession additional detailed information about Plaintiffs' secret, fraudulent preparation of the Cabrera Report.  Kohn is also likely to have relevant information relating to the new expert reports submitted in September 2010, after the fraud and collusion surrounding the Cabrera Report came to light.

In addition, Kohn will likely have information that will address what the District of New Mexico concluded "appears to be a payment ruse," according to which Kohn would make "donations" to Plaintiffs' environmental consultants to fund their work.  U.S. RJN Ex. R at 9, *aff'd id.*, Ex. S.  As correspondence from E-Tech explains: "In addition to allowing access to lower rates, working through E-Tech would continue to allow Kohn, Swift and Graf to make payments to E-Tech in the form of a public donation, as past correspondence with the firm has indicated. Please confirm that monies paid to E-Tech are public donations as opposed to private payments so that we can file accordingly with the IRS." Decl. Ex. P.

### 2.    Kohn's Support for Plaintiff-Affiliated Organizations

In addition to his support for Plaintiffs' consultants who ghost wrote the Cabrera Report, Kohn also facilitated the work of Plaintiff-affiliated organizations, including Amazon Watch, the Frente de Defensa de la Amazonia ("FDA"), and Selva Viva.[7]

---

[7] Amazon Watch purports to be a 501(c)(3) tax-exempt non-profit organization. *See* http://www.amazonwatch.org/about_us/. The FDA provides support to the Lago Agrio Plaintiffs and Plaintiffs' counsel. *See* "Who We Are" available at:

[Footnote continued on next page]

Kohn provided substantial financial support for Amazon Watch.  For example, Kohn's foundation, the Kohn Foundation, reported a $25,000 contribution to Amazon Watch in 2005. Decl. Ex. HH, at 3 (Excerpts of Kohn Foundation, Form 990-PF Return of Private Foundation, 2005).  Kohn's donations to Amazon Watch facilitated the Lago Agrio Litigation; indeed, Atossi Soltani, the Founder and Executive Director of Amazon Watch, admits in the *Crude* outtakes that Joseph Kohn specifically funded a trip by actress Daryl Hannah to meet *ex parte* with the presiding judge, stating that half of a recent $10,000 donation by "Joe" to Amazon Watch was used to pay Hannah's airfare.  Decl. Ex. A, B, (CRS-350-04-CLIP-10).

Representatives of Amazon Watch, including Soltani, are also seen in the *Crude* outtakes meeting with representatives of Plaintiffs and the FDA to discuss plans to intimidate the Lago Agrio court.  In a June 6, 2007 meeting between Donziger, Soltani, another representative of Amazon Watch, and FDA representative Luis Yanza, the participants discuss their plans to organize and finance attempts "to control the court, to pressure the court." As Donziger explains, "We believe they make decisions based on who they fear the most, not based on what the laws should dictate."   Decl. Ex. A, B (CRS-350-D4-CLIP-01).   Over the course of the meeting, Donziger outlines a two-part plan to increase the pressure on the Lago Agrio court, and tells the Amazon Watch representatives that approximately $100,000 is needed to fund the plan. Donziger describes the first part of the proposal as follows: "So, what we want to do is take over the court with a massive protest." He explains that the details of the first phase, "how we're

---

[Footnote continued from previous page]
http://www.texacotoxico.org/eng/node/1 ("We are currently involved in prosecuting Chevron Oil in an Ecuadorian court").  Selva Viva was established by Plaintiffs' counsel to manage and fund aspects of the Lago Agrio Litigation and, among other things, hosted the March 3, 2007 meeting between Plaintiffs' counsel, their consultants, and Cabrera.  *See supra*, § II.B.2; Decl. Ex. N at 82-83 ("The team that was doing the scientific work for plaintiffs called themselves Selva Viva").

gonna do it--like, are we just gonna be outside, are we actually gonna go in and shut the court down for a day-are all issues we need to figure out strategically." Decl. Ex. A, B (CRS-350-04-CLIP-01, -02).  For the second part of the plan, Donziger proposes that, after their initial, mass show of force, in order to maintain pressure on the court, "that we form our own army.  Private." Yanza then explains the "private army" concept: "It's-- it's-- it's called an army, but it's like a-- a group-- a specialized group, right, specialized for, uh-- ah-- for immediate action."  Decl. Ex. A, B (CRS-350-04-CLIP-02).

The details of Kohn's support for the FDA and Selva Viva are less clear, but evidence obtained to date suggests that money funneled to the FDA and Selva Viva may have been used for improper conduct.  In one of the *Crude* outtakes, Kohn suggests to Donziger that a person be paid "out of Selva, to save the bookkeeping."  Decl. Ex. A, B (CRS084-00-CLIP-03).  Selva Viva is also directly implicated in the relationship between Plaintiffs, the FDA, and Cabrera. Chevron has obtained copies of checks written to Cabrera from Selva Viva, and evidence that additional payments were made.  The records indicate that between June 28, 2007 and September 6, 2008, Selva Viva issued six checks to Cabrera, totaling about $263,899 (the checks are de-nominated in U.S. Dollars).  Decl. Ex. Q (Selva Viva's payments to Cabrera).  The full amount of payments Selva Viva or the FDA made to Cabrera is unknown.  Months before the first pay-ment on record, Cabrera submitted a letter to the court demanding payment from Chevron for his "honorariums."  Ecuador RJN Ex. K.  In the letter, Cabrera stated, "the honorarium agreed to by the FDA has already been paid to me."  *Id.*  But shortly after filing this demand, Cabrera changed his mind, and asked the clerk to return the letter.  When the clerk refused, Cabrera went to Judge

Nuñez, then presiding over the Lago Agrio Litigation,[8] who ordered the clerk of the court to re-
turn the letter to Cabrera.  Cabrera told the clerk that he simply wanted to provide better support-
ing documents, but upon receiving the letter back from the clerk, Cabrera tore it up on the spot,
and has filed no such supporting documents.  Ecuador RJN Ex. L.  Kohn's financing also raises a
number of additional questions.  In *Crude*, for example, Kohn is shown reviewing figures with
Donziger and states: "The big one is this inspection fee. Is that the judge's stuff?"  Decl. Ex. C.

### 3.   Kohn's Knowledge Concerning Other Conduct

In addition to his support for the Plaintiffs' consultants and Plaintiff-affiliated organiza-
tions, evidence obtained by Chevron shows that Kohn also has knowledge with respect to other
improper conduct, including efforts to pressure Ecuador's Prosecutor General to initiate false
criminal charges against the Chevron attorneys who executed the 1998 release, Rodrigo Pérez
Pallares and Ricardo Reis Veiga.[9]

The *Crude* outtakes show a January 2007 meeting, at which Donziger shows Kohn a re-
port that Ecuador's Attorney General forwarded to the U.S. Department of Justice summarizing
why TexPet's remediation supposedly was a fraud.  Donziger explains to Kohn that "we did the
work" on the report because "they [*i.e.*, the Ecuador Attorney General's office] don't even know
how to put out a press release, much less write a report."  Decl. Ex. A, B (CRS170-00-CLIP-03).
Donziger explains that certain conclusions in this report "might . . . make [Chevron] liable for

---

[8] Judge Nuñez recused himself after he was caught on video discussing his anticipated judg-
ment against Chevron and the award of remediation contracts to be funded by that judgment.
*See* Decl. Ex. K.  Ecuador's Judicial Council recently disbarred Judge Nuñez, stating that he
had broken legal regulations by expressing his opinion on the case before its conclusion.

[9] The concurrently filed 1782 application on behalf of Rodrigo Pérez Pallares and Ricardo
Reis Veiga describes the background facts relating to the false criminal charges in more de-
tail.

both civil and criminal penalties," and explains to Kohn that, the report "goes from the GAO, to the Prosecutor," and "the Prosecutor takes a look, and says, 'Okay, should I prosecute them based on this report?'" *Id.* Confirming the intentions behind this move, Kohn says to Donziger, "So, again, that may be something that we could facilitate going away at the right time . . . . if they wanted it to go away." Donziger replies, "Precisely." *Id.* In another scene, Donziger tells Kohn that Chevron is alleging a "conspiracy" between Plaintiffs and the Ecuadorian government, to which Kohn responds, "*If only they knew.*" *Id.* (CRS169-05-CLIP-09) (emphasis added).

In a recent hearing in the Southern District of New York, U.S. District Judge Lewis A. Kaplan noted, in particular, Kohn's statement in the *Crude* outtakes to the effect that "the whole criminal problem in Ecuador could be made by the plaintiffs to go away if somehow this whole thing could be wrapped up in a nice big settlement." U.S. RJN Ex. O (Sept. 23 Hr'g Tr. at 24:12-17); *see also id.* at 51:7-12; Decl. Ex. A, B (CRS170-00-CLIP-03). As Judge Kaplan recognized, the *Crude* outtakes "of Kohn and Donziger together makes clear that what it was really all about was something quite different. **They were trying to use the criminal process to extort a settlement from Chevron.**" *Id.* at 68:9-12.

### III.      SECTION 1782 ENTITLES CHEVRON TO DISCOVERY

To obtain discovery under 28 U.S.C. § 1782, the applicant must satisfy the statutory requirements as well as discretionary factors. As consistently recognized by **eleven** district courts and two appellate courts, the discovery sought by Chevron plainly meets the minimal showings required by Section 1782.

### A.      Chevron's Requested Discovery is Highly Relevant and Presumptively Discoverable Under Section 1782

The evidence shows that Kohn has knowledge relating to collusive and fraudulent conduct on behalf of Plaintiffs, including the financing and supervision of the consultants who ghost

wrote the Cabrera Report.  Further, the information in Kohn's possession, custody, or control is highly relevant to show, among other things, the extent of the collusive and fraudulent conduct on Plaintiffs' behalf, the partiality of the supposedly neutral court expert Cabrera, and the unreliability of Plaintiffs' expert reports.  Where the information sought is relevant, it is "presumptively discoverable" under Section 1782.  *In re Bayer AG*, 146 F.3d 188, 195-96 (3d Cir. 1998) ("relevant evidence is presumptively discoverable under § 1782 . . . .").

Cabrera's lack of independence is particularly significant.  Courts recognize that "[e]xperts appointed and supervised by a court carry special weight because of their presumed neutrality." *Edgar v. K.L.*, 93 F.3d 256, 261-62 (7th Cir. 1996).  Thus, courts insist that the work of such experts be "impartial, unbiased, neutral, objective, and unaffected by any relationship or contact" with the litigants.  *In re Silicone Gel Breast Implants Prods. Liab. Litig.* (MDL926), Case No. CV 92-P-10000-S, 1999 U.S. Dist. LEXIS 23526, at *2 (N.D. Ala. Apr. 25, 1999). The same was ordered of Cabrera, (Ex. H (Oct. 3, 2007 Order), 21), and Plaintiffs have defended his conclusions on grounds that he acted with "objectivity and impartiality[.]"

Courts treat the work of a court expert that is shown to have been "compromised" or "tainted" by party influence as "no longer reliable."  *See, e.g., Edgar*, 93 F.3d at 261-62 (court experts cannot be considered neutral if they are "influenced by secret submissions from advocacy groups and counsel supporting plaintiffs . . . ."); *G.K. Las Vegas Ltd. P'ship v. Simon Prop. Group*, Case No. CV-S-04-1199 DAE-GWF, 2009 U.S. Dist. LEXIS 111034, at *31, 34-35, n.6 (D. Nev. Nov. 30, 2009) (court declined to rely on evidentiary reports produced by ostensibly neutral, court-appointed expert where defendants had conducted *ex parte* meetings with the court expert and supplied it with document that the court expert "was not able to access on its own").

Chevron expects that the documents and sworn testimony of Kohn and his law firm will,

among other things, help to further prove Cabrera's bias, confirm Kohn's financial support for Cabrera and Plaintiffs' consultants, help to explain the relationship with Plaintiff-affiliated organizations such as Selva Viva, identify additional payments, and bring to light additional details concerning the collusive and fraudulent conduct on behalf of Plaintiffs.  "In these circumstances, the outtakes and other evidence demonstrate at least a significant need for the discovery sought . . . discovery concerning, *inter alia*, the role of the Lago Agrio plaintiffs in selecting and procuring the appointment of the expert, in writing his report," and in bringing sham criminal charges against Chevron employees.  U.S. RJN Ex. U, at 5.

**B.  Discovery Requested by Chevron Meets the Statutory Requirements of Section 1782**

Discovery under 28 U.S.C. § 1782 is proper if (1) directed at a resident of the District; (2) intended for use before a foreign tribunal; (3) based upon the application of a person interested in the foreign proceeding; and (4) not disclosing privileged materials.  The discovery sought by Chevron in the present application satisfies each requirement.

**1.  The Parties To Be Subpoenaed Are Residents of This District**

Joseph C. Kohn and Kohn, Swift & Graf, P.C. are both residents of this District.  Decl. Ex. R (PA Bar Record showing address of Kohn and his law firm in Philadelphia).

**2.  The Discovery Sought Is for Use in Foreign Tribunals**

The discovery Chevron seeks is for use in foreign tribunals, namely in the Lago Agrio Litigation and the Treaty Arbitration.  *Berlinger I*, 709 F. Supp. 2d at 291, *aff'd*, U.S. RJN Ex. H (*Chevron Corp. v. Berlinger*, Nos. 10-1918-cv, 10-1966-cv (2d Cir. July 15, 2010)).  Indeed, the proceeding in Lago Agrio is a paradigm example of a proceeding before a foreign tribunal for purposes of Section 1782.  *See, e.g., Intel,* 542 U.S. at 258.  The Treaty Arbitration has been brought under a bilateral investment treaty pursuant to the United Nations Commission on International Trade Law ("UNCITRAL") rules, and courts in the Third Circuit have held that com-

mercial arbitral panels authorized under bilateral investment treaties and constituted under UN-CITRAL rules also meet the statutory definition of a foreign tribunal. *See, e.g., In re Oxus Gold PLC*, Case No. MISC 06-82-GEB, 2007 U.S. Dist. LEXIS 24061, at *11-14 (D.N.J. Apr. 2, 2007) (Brown, C.J.); *Comision Ejecutiva Hidroelectrica del Rio Lempa v. Nejapa Power Co., LLC*, No. 08-135-GMS, 2008 WL 4809035, at *1 (D. Del. Oct. 14, 2008) (Sleet, C.J.).

### 3.      Chevron Is an "Interested Person"

As the defendant in the Lago Agrio Litigation and one of the claimants in the Treaty Arbitration, Chevron is an "interested person." *In re Application of Strand Invs. Ltd.*, Case No. 09-21985-CIV-MORENO, 2009 U.S. Dist. LEXIS 76445, at *3 (S.D. Fla. July 24, 2009) ("interested person" includes parties to international proceedings); *In re Oxus*, 2007 U.S. Dist. LEXIS 24061, at *19 ("The Supreme Court in *Intel* held that the text of § 1782(a), 'upon the application of any interested person,' plainly reaches beyond the universe of persons designated 'litigant'") (internal marks omitted); *In re Merck & Co.*, 197 F.R.D. 267, 271 (M.D.N.C. 2000) ("interested persons" include parties to international proceedings). Accordingly, the statutory prerequisites for discovery under Section 1782 are met.

## C.      The Discovery Does Not Seek Disclosure of Privileged Materials

Like Donziger, Kohn's role, at least in major respects, was not as a lawyer. *See supra,* note 2. Instead, Kohn financed the Lago Agrio Litigation and has information relating to at least some significant improper conduct. The documents and testimony sought here are therefore not privileged.[10] To the extent any privilege arguably attached to any of the documents and testi-

---

10 That Joseph Kohn is himself a lawyer does not grant him any special immunity from discovery. *See, e.g., Amobi v. D.C. Dep't of Corr.*, 262 F.R.D. 45, 50–54 (D.D.C. 2009) (permitting the plaintiff to depose an attorney who represented the defendant in arbitration proceed-

[Footnote continued on next page]

mony sought here, it has been waived at least three times. **First**, any alleged privilege would have been waived by the disclosure of Kohn's financial support to third parties, specifically the makers of the film *Crude*. **Second**, any alleged privilege would have been waived by the submission of payments, attorney work product, and consultant work product to the Lago Agrio court by Cabrera and other experts. And **third**, any alleged privilege would have been vitiated by the crime-fraud exception. Indeed, federal district courts have granted Chevron's Section 1782 applications and permitted discovery from lawyers Steven Donziger and Alberto Wray. *See supra*, n.1.

Much if not all of the material sought by Chevron is not even arguably privileged. Like Donziger, Kohn is not licensed to practice in Ecuador and does not represent the Plaintiffs before the Lago Agrio court. *See* U.S. RJN Ex. U at 5-6; U.S. RJN Ex. Y at 46. Additionally, Kohn's financing of the Lago Agrio Litigation is not protected client communication. The attorney-client privilege attaches to "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." *In re Teleglobe Comm's Corp.*, 493 F.3d 345, 359 (3d Cir. 2009). Thus, for example, attorney-client fee arrangements are almost categorically discoverable. *See, e.g., In re Grand Jury Investigation*, 631 F.2d 17, 19 (3d Cir. 1980) ("in the absence of unusual circumstances, the privilege does not shield the fact of retention, the identity of clients, and fee arrangements"); *In re Grand Jury Matter*, 926 F.2d 348, 351 (4th Cir. 1991) ("the attorney-client privilege normally does not extend to the payment of attorney's fees and expenses").

[Footnote continued from previous page]
ing on issue of whether counsel submitted false documents during arbitration, because information could establish that the plaintiff was deprived of a right to a fair hearing and "[n]o witness can claim immunity as to facts" ).

Even if Kohn asserts that some privilege attaches to certain information sought by the proposed subpoenas, any such asserted privilege has been waived by Plaintiffs' open discussions about Kohn's support for the Lago Agrio Litigation.  Kohn's support was openly discussed on camera by Kohn and Donziger in *Crude*, as was the use of those funds for expert witness payments.  Decl. Ex. C.  Related financial records were disclosed in *Crude*, and specific dollar amounts discussed.  *Id.*  Likewise, the *Crude* outtakes confirm Kohn's financing of the Lago Agrio Litigation, and specifically the work of the Plaintiffs' experts who ghost wrote the Cabrera Report.  Decl. Ex. A, B (CRS169-05-CLIP-01).  These public disclosures waive any attorney-client or work-product protection.  *See In re Teleglobe*, 493 F.3d at 361 ("[I]f persons other than the client, its attorney, or their agents are present, the communication is not made in confidence, and the privilege does not attach . . . . [I]f a client subsequently shares a privileged communication with a third party, then it is no longer confidential, and the privilege ceases to protect it . . . . The privilege does, after all, hinder the truth-seeking process, and so we carefully police its use."); *Westinghouse v. Republic of the Philippines*, 951 F.2d 1414, 1429 (3d Cir. 1991) ("the standard for waiving the work-product doctrine should be no more stringent than the standard for waiving the attorney-client privilege").

These public disclosures were plainly not inadvertent—to the contrary, Plaintiffs' representatives *recruited* the makers of *Crude* (Decl. Ex. S at ¶ 12)), and Kohn sat for an interview in which he explained, on camera, his reasoning for funding the Lago Agrio litigation.  Decl. Ex. C. Information voluntarily disclosed to a third-party filmmaker is plainly not privileged and cannot be said to have been inadvertently disclosed.  *See In re Hechinger Inv. Co. of Del., Inc.*, 303 B.R. 18, 26 (D. Del. 2003) (noting that "[t]he general rule that a disclosure waives not only the specific communication but also the subject matter of it in other communications is not appropriate

in the case of inadvertent disclosure").

Furthermore, any claims of privilege or work-product immunity are waived to the extent that the entities supported by Kohn (or Kohn himself) have submitted materials to Cabrera or other experts. "[W]hen a party provides attorney work product to a testifying expert and that information is 'considered' by the expert and becomes subject to the disclosure requirements of Rule 26(a)(2)(B), then the protection from disclosure ordinarily given to attorney work product is waived and the information must be disclosed." *Quinn Constr., Inc. v. Skanska USA Bldg., Inc.*, 263 F.R.D. 190, 196-97 (E.D. Pa. 2009) (noting that this holding is "consistent with that of the majority of district courts in this circuit"). Section 1782 discovery proceeds pursuant to the Federal Rules of Civil Procedure, and the mandatory disclosure requirement of Rule 26 logically applies to both Cabrera and to Plaintiffs' paid consultants who ghost wrote the Cabrera Report, thereby becoming testimonial experts themselves. *See* U.S. RJN Ex. P, 5 ("By the very nature of Cabrera's role, his report is 'testimony' that the Ecuadorian court will consider in making its ruling.").[11]

Any privilege here is also limited or eliminated by virtue of the crime-fraud exception to privilege. Otherwise privileged communications are subject to discovery where, as here, those communications were made in furtherance of a fraud. *In re Grand Jury Subpoena*, 223 F.3d 213,

---

[11] Plaintiffs' contentions, in other § 1782 proceedings, that Cabrera was permitted to rely on secret evidence submitted to him by the Plaintiffs but inaccessible to Chevron, in reaching his $27 billion damage assessment, are absurd. Not only do they fly in the face of the basic concept of due process, but they were already rejected by the Lago Agrio court itself, which held that, "all documents that serve as support or a source of information for the work performed by the Expert must be presented together with the report. At that time all those documents will be provided to the parties." Ecuador RJN Ex. M, 1. These claims also conflict with the 1998 Ecuadorian Constitution (in force when Cabrera was appointed), the current Ecuadorian Constitution, and a host of other Ecuadorian authorities *See generally* Decl. Ex. T.

217 (3d Cir. 2000). Plaintiffs' and their representatives' collaborations with Cabrera and his team, carried out in secret and designed to influence the results of his purportedly independent report, are part of Plaintiffs' fraudulent and collusive scheme here. Indeed, **four** federal judges in related Section 1782 proceedings have already found that the crime-fraud exception applies to overcome Plaintiffs' objections based on the attorney-client and work-product privileges. The District of New Jersey held that Chevron made a "prima facie demonstration of the operation of the crime-fraud exception" with regard to communications between Cabrera's agents and Plaintiffs' agents. U.S. RJN Ex. F at 43. Similarly, the Western District of North Carolina on August 30, 2010 applied the crime-fraud exception, stating that "what has blatantly occurred in this matter would in fact be considered fraud by any court." U.S. RJN Ex. N, at 12. And, on September 13, 2010, the District of New Mexico also applied the crime-fraud exception. U.S. RJN Ex. R, 11 ("The Court concludes that these discussions trigger the crime-fraud exception, because they relate to corruption of the judicial process, the preparation of fraudulent reports, the fabrication of evidence, and the preparation of the purported expert reports by the attorneys and their consultants"), *aff'd id.*, Ex. S; U.S. RJN Ex. G at 9 ("the crime-fraud exception applies"). And the Southern District of New York, denying Donziger's motion to quash Chevron's subpoena directed at him, observed that "there is more than a little evidence that Donziger's activities—as several courts already have held in the context of Section 1782 applications against experts involved on the Lago Agrio plaintiff's side—come within the crime-fraud exception to both the privilege and to work product protection." U.S. RJN Ex. Y at 47. As the "de facto partner" who is "the one that's behind this whole thing" (Decl. Ex. A, B (CRS169-04-CLIP-01)), Kohn is likely to have substantial information that is relevant to the fraudulent scheme against Chevron. If any privilege is asserted to apply here, the crime-fraud exception applies and overcomes such

an asserted privilege.[12]

## D.   Discretionary Factors Strongly Militate In Favor Of Allowing The Requested Discovery

The Supreme Court has directed district courts to consider four factors in exercising their discretion to grant a Section 1782 application:  (1) whether the request is unduly intrusive or burdensome; (2) whether the person from whom discovery is sought is a participant (as in party) in the foreign proceeding; (3) the receptivity of the foreign tribunal to federal-court assistance; and (4) whether the request constitutes an attempt to circumvent foreign proof-gathering restrictions. *See Intel*, 542 U.S. at 264-65; *In re Heraeus Kulzer, GmbH*, No. 09-MC-00017, 2009 WL 2981921, at *2 (E.D. Pa. Sept. 11, 2009) (Rufe, J); *In re Oxus*, 2007 U.S. Dist. LEXIS 24061, at *7-8.  As found by <u>every single court</u> to consider Chevron's numerous Section 1782 applications, each factor weighs heavily in favor of granting the requested discovery.

### 1.   Discovery Requested by Chevron is Appropriately Focused

Chevron seeks discovery into information in Kohn's possession, custody, or control relating to the fraud and collusion in connection with the Lago Agrio Litigation, including his direct and indirect financial support for the purportedly impartial Special Master in the Lago Agrio Litigation.  As set forth above, such discovery is well within the scope of typical expert discovery in U.S. courts.  In addition, "[c]onsistent with the statute's modest prima facie elements and Congress's goal of providing equitable and efficacious discovery procedures, district courts should treat relevant discovery materials sought pursuant to § 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the appli-

---

[12] The same would, of course, apply to any documents or communications made or used in furtherance of the Plaintiffs' collusion with the Republic of Ecuador.

cation." *In re Bayer AG*, 146 F.3d at 195.

### 2. Kohn and His Law Firm Are Not Parties to the Lago Agrio Litigation or the Treaty Arbitration

Another discretionary factor is whether the party from whom discovery is sought is a party to the foreign litigation at issue. *Intel*, 542 U.S. at 264; *In re Roz Trading Ltd.*, Case No. 1:06-cv-02305-WSD, 2007 U.S. Dist. LEXIS 2112, at *6 (N.D. Ga. Jan. 11, 2007) ("Respondent is not a party to the arbitration, and on this ground alone the first *Intel* factor is satisfied."). Kohn and his law firm are not parties to the Lago Agrio Litigation or the Treaty Arbitration. This is not a situation where "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Intel*, 542 U.S. at 264. The status of Kohn and his law firm as United States residents under the jurisdiction of this Court thus weighs heavily in favor of granting this Application for his deposition and the production of documents regarding financial support provided by him and his firm in connection with the Lago Agrio Litigation.

### 3. Ecuadorian Courts and UNCITRAL Arbitral Panels Historically Have Been Receptive To Federal Court Assistance Under Section 1782

Section 1782 previously has been applied to authorize discovery for matters pending in Ecuadorian courts, including the Lago Agrio Litigation itself. *See note 1, supra; see also, e.g., In re Compania Chilena de Navegacion Interoceanica S.A.*, Case No. 03 CV 5382 (ERK), 2004 U.S. Dist. LEXIS 6408, at *12-13 (E.D.N.Y. Jan. 29, 2004); *In re Noboa*, Nos. M18-302, M19-111, 1995 U.S. Dist. LEXIS 14402, at *1-2, 11-12 (S.D.N.Y. Oct. 3, 1995).

The use of Section 1782 in the Treaty Arbitration and other public investment arbitrations also is well established. *See, e.g., In re Oxus*, 2007 U.S. Dist. LEXIS 24061, at *11-14 (court in Third Circuit holding that Section 1782 applies to public investment treaty arbitrations that are subject to UNCITRAL rules); *In re Application of Babcock Borsig AG*, 583 F. Supp. 2d 233, 238-40 (D. Mass. 2008) (finding that "private arbitral bodies like the [International Court of Ar-

bitration]" constitute "tribunals" pursuant to § 1782); *Berlinger I*, 709 F. Supp. 2d at 291 (granting Chevron's application to conduct discovery for use in the Treaty Arbitration); *Ukrnafta v. Carpatsky Petroleum Corp.*, Case No. 3:09-MC-265 (JBA), 2009 U.S. Dist. LEXIS 109492, at *12-13 (D. Conn. Aug. 27, 2009) (granting plaintiff's *ex parte* application for service of discovery pursuant to § 1782 for use in international arbitral proceeding). Thus, this factor also weighs in favor of granting Chevron's Application.

### 4. This Application Seeks Probative And Relevant Evidence For Two Foreign Proceedings, And In No Way Circumvents Foreign Proof-Gathering Restrictions

Section 1782 does not require that the information sought be discoverable under the procedures of the foreign tribunal. *Intel,* 542 U.S. at 261; *Weber v. Finker*, 554 F.3d 1379, 1384-85 (11th Cir. 2009). Rather, in determining whether an application amounts to an effort to circumvent foreign proof-gathering restrictions, the issue for a district court is whether the discovery is being sought in bad faith. *Minatec Fin. S.A.R.L. v. SI Group Inc.*, No. 1:08-CV-269 (LEK/RFT), 2008 U.S. Dist. LEXIS 63802, at *26 (N.D.N.Y Aug. 18, 2008) ("The primary issue for us is whether [Applicant] is pursuing this discovery in bad faith.").

Chevron's request for discovery from Kohn is a good faith effort to obtain probative evidence from a key person with knowledge relating to the fraud and collusion in the Lago Agrio Litigation, including any undisclosed payments to, or in support of, the court expert. Chevron is unaware of any restrictions in either the Lago Agrio Litigation or the Treaty Arbitration that would affirmatively prohibit the discovery it seeks.

Any relevant evidence developed would be admissible under Ecuadorian law, in light of the fact that the parties have the right to challenge the conclusions of an expert, to present evidence, and to challenge evidence presented against them. *See* Ecuador RJN Ex. P (Art. 257 of the Ecuadorian Civil Procedure Code). Moreover, Ecuadorian judges may, at any time before a

final ruling, order the production of any evidence necessary to clarify the truth of any issue in the proceeding. Ecuador RJN Ex. N (Art. 118 of the Ecuadorian Civil Procedure Code). Likewise, relevant evidence may be used in the Treaty Arbitration as part of the evidence presented, for direct examination, or in cross examination of witnesses. *See* GAOR Resolution 31/98, Arbitration Rules of the United Nations Commission on International Trade Law, Article 24 (Dec. 15, 1976).

## IV.     CONCLUSION

For the foregoing reasons, Chevron respectfully requests that this Court approve the application for a subpoena on an expedited basis and enter an Order to Show Cause setting an extremely abbreviated briefing schedule on both the application and any objections or motions directed to the subpoenas. In addition, given the egregious nature of the fraud, Chevron also asks the Court to put in place whatever requirements, procedures, or protocols may be necessary to preserve the evidence Chevron seeks during the pendency of this Application.

Dated: November 16, 2010                     Respectfully submitted,


Arthur Makadon (Pa. I.D. No. 17104)
Burt M. Rublin (Pa. I.D. No.32444)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: 215.665.8500
Facsimile: 215.864.8999

OF COUNSEL:

GIBSON, DUNN & CRUTCHER LLP
Randy M. Mastro
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Scott A. Edelman
2029 Century Park East
Los Angeles, CA 90067
Telephone: 310.552.8500
Facsimile: 310.551.8741

Andrea E. Neuman
3161 Michelson Drive
Irvine, CA 92612
Telephone: 949.451.3800
Facsimile: 949.451.4220

*Attorneys for Applicant Chevron Corporation*

100823040.DOC