IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE APPLICATION OF CHEVRON CORPORATION for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings, | : : : : | MISCELLANEOUS ACTON<br><br>No. 10-MC-208 |
| RODRIGO PEREZ PALLARES and, RICARDO REIS VEIGA,<br>    Petitioners,<br>v.<br>JOSEPH C. KOHN, ESQUIRE and KOHN, SWIFT & GRAF, P.C.,<br>    Respondents. | : : : : : : : : : : : | MISCELLANEOUS ACTON<br><br>No. 10-MC-209 |

DuBOIS, J.                                                                                            December 20, 2010

**M E M O R A N D U M**

    Before the Court are (1) applications by Chevron Corporation ("Chevron") and two of its attorneys, Rorigo Pérez Pallares ("Pallares") and Ricardo Reis Veiga ("Veiga") (collectively, "the applicants"), pursuant to 28 U.S.C. § 1782(a), for the issuance of subpoenas requiring respondents Joseph C. Kohn and his law firm, Kohn, Swift & Graf, P.C. ("KSG") (collectively, the "respondents"), to produce documents and appear at depositions in Philadelphia; (see Proposed Subpoena, Ex. GG to Application of Chevron Corp.; Proposed Subpoena, Ex. 26 to Application of Pallares and Veiga); and (2) a Motion for In Camera Review or Appointment of a Special Master filed by the Republic of Ecuador (the "Republic"). Intervening as interested parties are the Republic and the plaintiffs in an ongoing litigation against Chevron in Ecuador (the "Lago Agrio Plaintiffs") (collectively, the "Interested Parties"). For the reasons set forth below, the Court grants both the application of Chevron and that of Pallares and Veiga. The

Court denies the Republic's Motion for In Camera Review or Appointment of a Special Master.

I.      INTRODUCTION

This matter arises out of long-running litigation against Texaco and its corporate successor, Chevron Corporation, for environmental damage caused by oil drilling and exploration in the Lago Agrio region of Ecuador. The Court will address only the procedural and factual background directly relevant to the legal issues confronted. Additional background information can be found in the parties' voluminous submissions which were filed of record and in decisions issued by courts in related matters in other jurisdictions. See, e.g., In re Application of Veiga, No. 10-MC-310, 2010 U.S. Dist. LEXIS 116999 (D.D.C. Nov. 3, 2010); In re Application of Chevron Corp., 709 F. Supp. 2d 283 (S.D.N.Y. 2010).

A Texaco subsidiary, TexPet, began oil exploration and drilling in eastern Ecauador in 1964. In 1993, a group of Ecuadorian nationals filed a class action lawsuit against Texaco in the U.S. District Court for the Southern District of New York, seeking damages stemming from environmental contamination allegedly caused by Texaco. Stephen Donziger and Joseph Kohn were two of the lawyers representing the Ecaudorian plaintiffs. See Aguinda v. Texaco, Inc., 142 F. Supp. 2d 524, 536, 2001 U.S. Dist. LEXIS 6981 at *4 (S.D.N.Y. 2001). While this litigation, known as the "Aguinda Litigation," was pending, TexPet entered into a settlement agreement with the Republic and the Republic's state-owned oil company, Petroecuador. In this agreement TexPet agreed to perform specified environmental remediation work in exchange for a release of claims by the Government of Ecuador. In 1998, the Republic agreed that all specified remediation had been performed and the release became final. Thereafter, the Aguinda Litigation

was dismissed on forum non conveniens grounds. See Aguinda v. Texaco, Inc., 142 F. Supp. 2d 534 (S.D.N.Y. 2001). The plaintiffs in that case filed a timely appeal.

In 2003, soon after the dismissal of the Aguinda Litigation was affirmed by the U.S. Court of Appeals for the Second Circuit, Aguinda v. Texaco, Inc., 303 F.3d 470 (2d. Cir. 2002), Kohn and Donziger assisted a group of Ecuadorian lawyers in filing a suit in Ecuador against Chevron, into which Texaco had merged in 2001. This law suit is known as the "Lago Agrio Litigation." Both the Auginda Litigation and the Lago Agrio Litigation were financed in substantial part by Kohn and KSG, which also assisted the Lago Agrio Plaintiffs with legal and public relations strategy.

In 2005, as the Lago Agrio Litigation progressed, lawyers for the Lago Agrio Plaintiffs engaged a documentary film maker, Joe Berlinger, and his crew to make a film about the litigation. The film, eventually released under the title Crude, focuses on the work of the lawyers for the Lago Agrio Plaintiffs and includes footage of legal strategy meetings held by the lawyers and consultants working for the Lago Agrio Plaintiffs. Some of the footage included in the film suggests improprieties on the part of Doziger and other lawyers for the Lago Agrio plaintiffs. Most notably, the film shows Doziger and other Lago Agrio plaintiffs' lawyers meeting ex parte with a supposedly neutral scientific expert, Richard Stalin Cabrera Vega ("Cabrera"), appointed by the Ecuadorian court, and discussing to discuss the details and proposed findings of his report (the "Cabrera report"). After the film's release, Chevron filed a § 1782 application in the Southern District of New York seeking an order compelling the production of unreleased footage from the filming. That request was granted in May 2010. In re Application of Chevron Corp., 709 F. Supp.2d 283 (S.D.N.Y. 2010). Subsequently, the same court ordered Donziger to provide

3

documents and deposition testimony. In re Chevron Corp., No. 10-MC-2, 2010 U.S. Dist. LEXIS 125432 (S.D.N.Y. Nov. 29, 2010). Applicants base their claims in this matter in large part on materials uncovered in the § 1782 proceedings in the Southern District of New York.

Chevron alleges that the Lago Agrio plaintiffs have engaged in fraudulent and illegal behavior in their pursuit of the Lago Agrio Litigation. Chevron's allegations center primarily on the preparation of the Cabrera report, which Chevron claims was ghostwritten by U.S. environmental consultants hired by the Lago Agrio Plaintiffs. Chevron and the individual applicants allege that the Cabrera report plays a substantial role in the criminal charges against the individual applicants, and that the criminal charges themselves are a product of a collusive attempt by the Lago Agrio Plaintiffs and the Republic to extort an illegitimate settlement from Chevron. Chevron also alleges that the Lago Agrio Plaintiffs attempted to intimidate members of the Ecuadorian Judiciary and committed fraud with respect to other evidence and expert reports they submitted to the Ecuadorian court.

In August 2008 the Ecuadorian Prosecutor General opened a criminal investigation of Pallares and Veiga, two lawyers who signed the remediation agreement on behalf of TexPet. In April 2010 the Prosecutor General filed charges against Pallares and Veiga, accusing them of falsifying information related to the 1995-1998 settlement agreement and release between TexPet, the Republic, and PetroEcuador. The charges against Pallares and Veiga are based in part on the Cabrera report, which applicants claim was actually written by consultants for the Lago Agrio Plaintiffs despite its supposedly neutral source.

In 2009 Chevron initiated an international arbitration (the "BIT arbitration"), pursuant to the United Nations Commission on International Law ("UNCITRAL"), against the Republic. In those proceedings, Chevron attacked the Republic's filing of criminal proceedings against

Pallares and Veiga and alleged violations of the American Convention on Civil Rights and the Bilateral Investment Treaty between the United States and Ecuador. Specifically, Chevron alleged that the criminal charges against Pallares and Veiga were part of the Republic's efforts to undermine the 1995-1998 settlement agreement and release and obtain an illegitimate financial windfall from Chevron.

## II. 28 U.S.C. § 1782

The applications at issue were filed pursuant to 28 U.S.C. § 1782. Granting discovery under § 1782 requires a two-step analysis. In the first step, the court determines whether the application satisfies the statutory prerequisites and whether the court has discretion to permit discovery under the statute. In the second step, the Court determines whether and how to exercise its discretion. See Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241 (2004).

### A. Statutory Requirements

28 U.S.C. § 1782 provides, in pertinent part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. . . . A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

28 U.S.C. § 1782(a). In Intel, the Supreme Court interpreted the statute as requiring the satisfaction of three elements: (1) a person's presence in the district, (2) an application from an interested person, and (3) an ongoing or contemplated foreign proceeding. 542 U.S. at 246-47, 261. If these requirements are met, the court is authorized, but not required, to permit discovery under § 1782. Id.

It is beyond dispute that Kohn and KSG are present in the Eastern District of

Pennsylvania. (See Ex R. to Application by Chevron Corp.) Likewise, the respondents and intervening parties do not contest that Chevron and the criminal defendants, as parties in related litigation, qualify as interested persons under the statute. See Intel 546 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782."). Likewise, there is no doubt that the cases in the Ecuadorian civil and criminal courts constitute proceedings for purposes of the statute.

The only statutory prerequisite contested in the briefs is whether the BIT arbitration constitutes a proceeding under the statute. The Lago Agrio Plaintiffs contend that international arbitrations are beyond the scope of § 1782. While some pre-Intel decisions held that international arbitrations were beyond the scope of § 1782, see, e.g., NBC v. Bear Stearns, Inc., 165 F.3d 184 (3d Cir. 1999), this Court concludes that more recent authority supports the contention that international arbitrations, such as the BIT arbitration, are included. The Court notes, first, that the Intel Court determined that as used in § 1782, the word "tribunal" includes international arbitral tribunals. Intel, 542 U.S. at 258 (quoting Hans Smit, International Litigation under the United States Code, 65 Colum. L. Rev. 1015, 1026-27 & nn.71, 73 (1965)). Courts that have addressed the question after Intel have consistently found that international arbitrations are included. See, e.g., In re Application of Oxus Gold PLC, No. 06-mc-82, 2007 WL 1037387, at *5 (D.N.J. Apr. 2, 2007); OJSC Urknafta v. Captsky Petroleum Corp., No. 09-mc-265, 2009 WL 2877156, at *4 (D. Conn. Aug. 27, 2009). Moreover, other district courts confronted with related applications have found that the specific BIT arbitration at issue here is a proceeding under § 1782. See In re Application of Veiga, No. 10-mc-371, 2010 U.S.Dist. LEXIS 111468 at *34 (D.D.C. Oct. 20, 2010); Republic of Ecuador, No. 10-mc-00040, 2010 WL 4027740, at *1-2 (E.D. Cal. Oct. 14, 2010); In re Application of Chevron Corp., 709 F.Supp. 2d

6

283 (S.D.N.Y. 2010). This Court agrees with these rulings and concludes that the statutory requirements are met with respect to all three foreign proceedings.

B.    Discretionary Factors

In Intel, the Supreme Court set fourth four factors for courts to consider when ruling on a request under § 1782: (1) whether the person from whom discovery is sought is a party in the foreign proceeding and subject to the jurisdiction of the foreign tribunal, (2) the nature of the foreign tribunal and its receptivity to U.S. judicial assistance, (3) whether the request attempts to circumvent foreign proof-gathering restrictions, and (4) whether the request is unduly intrusive or burdensome. 542 U.S. at 264-66. A court presented with an application under § 1782 also retains discretion to impose conditions on discovery that it deems appropriate. In re Application of Bayer AG, 146 F.3d 188, 192 (3d Cir. 1998).

The Court will consider the four Intel discretionary factors in turn.

    1.    *Whether Respondents Are Subject to the Jurisdiction of the Foreign Tribunals*

Kohn is a U.S. citizen residing in Pennsylvania. KSG is a law firm and a creature of Pennsylvania law with its only office located in Philadelphia. Neither Kohn nor KSG is a party to any of the foreign proceedings, and neither is subject to the jurisdiction of those tribunals. These facts weigh in favor of granting relief under § 1782 because, as the Supreme Court stated in Intel, the evidence of nonparticipants outside the reach of the foreign tribunal's jurisdiction "may be unobtainable absent § 1782(a) aid." 542 U.S. at 264.

    2.    *The Nature of the Foreign Tribunals and Their Receptivity to U.S. Judicial Assistance*

The foreign tribunals for which the applicants seek discovery consist of two Ecuadorian Courts and an international arbitration proceeding convened under the UNCITRAL rules. All

7

three tribunals are confronted with extremely significant matters. In the Ecuadorian criminal court, the defendants face serious criminal charges for allegedly defrauding the Ecaudorian government. In the Ecuadorian civil court and the BIT arbitration, the claimed damages against Chevron have been estimated to be as much as $113 billion.

Nonetheless, the Lago Agrio Plaintiffs contend that the foreign tribunals are not receptive to judicial assistance from United States courts. However, persons applying for discovery under § 1782 enjoy a presumption in favor of foreign tribunal receptivity that can only be offset by reliable evidence that the tribunal would reject the evidence. See, e.g, Euromepa S.A. v. R. Esmerian, Inc., 51 F.3d 1095, 1099-1100 (2d Cir. 1995) ("[W]e believe that a district court's inquiry into the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782."); In re Application of Caratube Int'l Oil Co., No. 10-0285, 2010 WL 3155822, at *4 (D.D.C. Aug. 11, 2010).

The intervening parties have presented no such reliable evidence of non-receptivity in this case for any of the foreign tribunals. To the contrary, other federal courts have found both Ecuadorian courts and international arbitrations preceding under UNCITRAL rules receptive to aid under § 1782. See, e.g., Oxus Gold, 2007 U.S. Dist. LEXIS 24061, 2007 WL 1037387, at *5 (UNCITRAL-governed arbitration); In re Petition of Compania Chilena de Navegacion, 2004 WL 1084243, at *4-5 (E.D.N.Y. Feb. 6, 2004) (Ecuadorian court); In re Application of Noboa, 1995 WL 581713, at *1-2 (S.D.N.Y. Oct. 4, 1995) (Ecuadorian court). Given that the intervening parties have presented no authoritative evidence that the foreign tribunals would not be receptive to U.S. court aid, the Court concludes that this discretionary factor weighs in favor of granting the applications. This conclusion is in keeping with at the decision of least one other

district court faced with a related petition and similar arguments. See In re Application of Veiga, 2010 U.S.Dist. LEXIS 111468 at *37 (D.D.C. October 20, 2010).

        3.     *Whether the Applications Attempt to Circumvent Foreign Proof-Gathering Restrictions*

The Ecaudorian plaintiffs do not attempt to show that the pending applications here attempt to circumvent foreign proof gathering restrictions. Intel made clear § 1782 does not require that the discovery sought would be discoverable or admissible under the rules of foreign tribunal. 542 U.S. at 247, 262. Thus consideration of the third Intel factor does not favor denying the applications.

        4.     *Whether the Request is Unduly Intrusive or Burdensome*

Lago Agrio Plaintiffs contend that the applications are unduly intrusive and burdensome. However, this factor is intended primarily to protect the party from whom discovery is sought. Respondents Kohn and KSG do not object to the scope of the requests in applicants' proposed subpoenas, and have already prepared a privilege log of requested documents. Accordingly the Court concludes that the applications are not unduly intrusive or burdensome on respondents, and this factor does not weigh against granting the applications.

The Court determines that, taken as a whole, the Intel factors weigh in favor of granting the applications. The Court next turns to the question of whether the documents sought by the subpoena are shielded from disclosure by privilege or the work-product doctrine.

## III. PRIVILEGE AND WORK PRODUCT DOCTRINE

The intervening parties contend that many of the documents requested in the proposed subpoenas are subject to attorney-client privilege or work product protection. The Third Circuit has described the traditional elements of attorney-client privilege as follows:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his or her subordinate, and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and (d) not for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

Rhone-Poulenc Rorer v. Home Indem. Co., 32 F.3d 851, 862 (3d Cir. 1994).

The work-product doctrine expands on the protection afforded by attorney-client privilege in order to "shelter the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." United States v. Nobles, 422 U.S. 225, 238 (1975). The work-product doctrine is governed by Rule 26(b)(3) of the Federal Rules of Civil Procedure, which specifies that the doctrine applies to "documents and tangible things . . . prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3). Both attorney-client privilege and the work-product doctrine are subject to limitation and susceptible to waiver when a client or its representative discloses otherwise protected information to a third party not involved in the representation. See, e.g., In re Grand Jury, 138 F.3d 978, 981 (3d Cir. 1998).

Applicants make four arguments why the documents and deposition testimony they seek are not protected by attorney-client privilege or the work-product doctrine. First they contend that Kohn's involvement in this litigation was in significant respects not as a lawyer. They also raise three arguments to the effect that any applicable privilege or work-product protection has been waived through one or more of the following: (1) inviting a film crew to attend and record various meetings where legal strategy, expert reports, and case finances were discussed; (2) the crime-fraud exception; and (3) the submission of payments, attorney work-product, and consultant work-product to the Lago Agrio court by Cabrera and other experts. The Court will

address these arguments in turn.

      A.      <u>Application of Attorney-Client Privilege and Work-Product Doctrine</u>

Applicants contend that Kohn was acting primarily as a financier rather than a lawyer and argue that attorney fee arrangements are not usually privileged. Kohn and KSG assert, however, that they played a "major role in briefing and discovery" in the Aguinda Litigation and that their "more limited" role in the Lagio Agrio Litigation included legal representation and overall strategic guidance. (Response and Objections of KSG at 3-4.)

Contrary to applicants' description of Kohn's role, much of the evidence provided by applicants also reveals Kohn and KSG's participation in developing legal and settlement strategy for the Ecaudorian Plaintiffs. (<u>See, e.g.</u>, Emails to Joseph Kohn, Ex. 21 to Chevron's Reply to Ecuadorian Pls.' Opp'n (discussing legal strategy and inviting Kohn to attend strategy meeting Washington D.C.); Email to Joseph Kohn, Ex. 54 to Chevron's Reply to Ecuadorian Pls.' Opp'n (discussing overall litigation strategy); Letter from Kohn, Ex. 84 to Chevron's Reply to Ecuadorian Pls.' Opp'n (describing the termination of Kohn's role as an attorney for Lago Agrio Plaintiffs).) This evidence is supported by Kohn's assertion that he was employed in the Lago Agrio Litigation as a lawyer rather than as a mere financier. The Court thus finds that Kohn was engaged in that matter as a lawyer and that documents and information in Kohn's possession relating to that matter are eligible for privilege or work-product protection. However, for the reasons discussed, <u>infra</u>, the Court concludes that the applicable privilege and work-product protection are waived for documents and other information sought by applicants which relate to the Lago Agrio Litigation.

      B.      <u>Waiver of Privilege by Disclosure to Third Parties</u>

Applicants contend that Kohn and KSG waived any otherwise applicable privilege or

work-product protection by soliciting a documentary film crew to attend and record numerous meetings and discussions the content of which would otherwise be shielded from discovery. As a general rule, disclosure to a third party not involved in the litigation waives privilege and work-product protection. See 8 Charles Allan Wright, Arthur R. Miller & Mary K. Kane, Federal. Practice and Procedure § 2016.4 (3d ed.). Intentional disclosure, like that in this case, waives protection for "any information directly related to that which was actually disclosed." United States v. Workman, 138 F.3d 1261, 1263 (8th Cir. 1998).

The Court finds that, by inviting a documentary film crew to attend and record attorney meetings and other events where confidential matters were discussed, the Lago Agrio plaintiffs waived any otherwise applicable privilege or work-product protection for documents related to the Lago Agrio Litigation. The hundreds of hours of footage from the filming of Crude demonstrate that the Lago Agrio Plaintiffs arranged for the filmmakers to attend numerous attorney meetings and gave them broad access to information that would usually be treated as a confidential part of the attorney-client relationship. To cite just a few examples, the footage reveals film crew's presence at the following:

1) A meeting in the KSG offices during which Kohn, Donziger, and other attorneys for the Lago Agrio Plaintiffs discussed the financing of the litigation, including the costs of expert witnesses and technical reports and related strategy (Crude, Ex. 2, Application of Pallares);

2) A meeting, apparently also at KSG, between Kohn and Donziger, at which they discuss the Cabrera report and use of American consulting firms to perform related scientific research (CRS-169-05-CLIP-01, Ex. A, Application of Chevron);

3) A conversation between Kohn and Donziger discussing the possibility of criminal charges against Pallares and Veiga and settlement strategies to be pursued against Chevron (CRS-170-00-CLIP-03, Ex. A, Application of Chevron);

4) A March 3, 2007 meeting in Ecuador between members of the Lago Agrio Plaintiffs' legal team, the Lago Agrio Plaintiffs' technical experts, and Richard Cabrera that included detailed discussion of the Cabrera Report, scientific research related to the Cabrera report, and related legal strategy (CRS-187-01-02-CLIP-01, Ex. A, Application of Chevron); and

5) A March 4, 2007 meeting during which Donziger and two scientific experts working on behalf of the Lago Agrio Plaintiffs discussed work on the Cabrera report (CRS-198-00-CLIP-00).

The voluntary disclosure by a client of a privileged communication waives the privilege as to other such communications relating to the same subject matter made both prior to and after the occurrence of the waiver. Murray v. Gemplus International, 217 F.R.D. 362, 367 (E.D. Pa. 2003). Under some circumstances, a party making a very limited intentional disclosure is entitled to a fairness balancing test to determine if that the waiver extends to related documents. See, e.g., Westinghouse Elec. Corp. v. Republic of Phil., 951 F.2d 1414, 1426 at n.13 (3d Cir. 1991). The Court concludes, however, that given the truly exceptional scope of the waiver in this case, the Lago Agrio Plaintiffs are not entitled to such a balancing test. To allow the Lago Agrio Plaintiffs to waive privilege expansively for favorable documents and information as part of a calculated public relations campaign and then shield related documents behind the screen of privilege would be to permit the use of privilege and the work product doctrine as both sword and shield, an abuse that courts have discouraged. See, e.g., Gemplus Int'l, 217 F.R.D. at 367;

13

see also Teleglobe Communs. Corp. v. BCE, Inc., 493 F.3d 345, 361 (3d Cir. 2007) ("The privilege does, after all, hinder the truth-seeking process, and so we carefully police its use.")

Given that these disclosures were intentional and covered the entire scope of the ongoing Lago Agrio Litigation, including expert reports, legal strategy, and settlement strategy, the Court concludes that the Lago Agrio Plaintiffs have waived any otherwise applicable attorney-client privilege and work-product protections for documents and deposition testimony related to the Lago Agrio Litigation.

    C.    The Crime-Fraud Exception

        1.    *Legal Standard*

The crime-fraud exception overrides an otherwise applicable privilege where a lawyer's services are used in furtherance of a crime or fraud. In re Grand Jury Investigation, 445 F.3d 266, 274 (3d Cir. 2006). The party seeking application of the crime-fraud exception "must make a prima facie showing that (1) the client was committing or intending to commit a fraud or crime, and (2) the attorney-client communications were in furtherance of that alleged crime or fraud." Id. In this context "a prima facie showing requires presentation of evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met." Id. (internal quotation marks omitted).

Applicants have presented thousands of pages of documentary evidence and hours of video footage intended to establish a prima facie case that Donzinger and other representatives of the Lago Agrio Plaintiffs were engaged in fraudulent behavior in the course of the Lago Agrio litigation. Specifically, the evidence is intended to show that Donzinger and other representatives of the plaintiffs ghostwrote the supposedly neutral Cabrera report, deceived the Ecaudorian court with respect to that and other expert reports, colluded with the Republic to

14

bring baseless criminal charges against Pallares and Veiga as a means of extorting a settlement with Chevron, and tried to intimidate members of the Ecuadorian judiciary. The Court concludes, however, that because the Lago Agrio Plaintiffs waived privilege broadly through public disclosure, it need not consider the crime-fraud exception.

  D. <u>Waiver Through the Submission of Payments, Attorney Work-product, and Consultant Work-Product to the Lago Agrio Court by Cabrera and Other Experts</u>

Applicants also contend that any information submitted to Cabrera, the independent scientific expert appointed by the Ecuadorian court, is not protected by privilege or the work-product doctrine. Because the Court finds that plaintiffs have waived any privilege or work-product protection by inviting a film crew to attend and record numerous otherwise protected meetings, it is unnecessary to reach this question.

  E. <u>Community-of-Interest Privilege</u>[1]

The Republic argues that certain documents, prepared as part of a community-of-interest agreement with the Lago Agrio Plaintiffs initiated after Chevron filed an arbitration proceeding in 2004, are still subject to privilege notwithstanding any waiver by the Lago Agrio Plaintiffs because of the community-of-interest privilege. "[T]he community-of-interest doctrine . . . protects parties, with shared interest in actual or potential litigation against a common adversary, from waiving their right to assert privilege when they share privileged information. The nature of

---

[1] In their briefs, some of the parties attempt to distinguish between the community-of-interest privilege, also known as the "common-interest privilege," and the joint-defense privilege. The Court concludes, however, that if there was once a distinction between the two, it has been abolished and that courts in this Circuit now apply only the community-of-interest privilege. See Teleglobe Communs. Corp. v. BCE, Inc., 493 F.3d 345, 364 (3d Cir. 2007) ("[T]he community-of-interest privilege has completely replaced the old joint-defense privilege for information sharing among clients with different attorneys. Thus, courts should no longer purport to apply the joint-defense privilege.") (citing Restatement (3d) of the Law Governing Lawyers § 76).

the interest, however, must be identical, not similar, and be legal, not solely commercial." Cargill, Inc. v. LGX LLC, No. 00-CV-4252, 2007 U.S. Dist. LEXIS 56000 (E.D. Pa. July 18, 2007) (E.D. Pa. July 13, 2007) (internal citations omitted). Decisions in this Circuit have emphasized the requirements of identical legal interests. See In re Diet Drugs Product Liability Litig., No. MDL 1203, 2001 U.S. Dist. LEXIS 5494 at 15 (E.D. Pa. April 19, 2001) ("the subject matter [of communications] must be a of a legal nature – something more than mere concurrent legal interest or concerns – and there may not exist any divergence in the interests."); Grider v. Keystone Health Plan, Inc., No. 05-MC-40, 2005 U.S. Dist. LEXIS 44069 at *21 (E.D. Pa. July 28, 2005).

In support of its claim of privilege, the Republic offers the sworn declaration of Eric Bloom dated December 16, 2010, which states that the Republic entered into a common interest agreement with the Lago Agrio Plaintiffs in 2006 in response to an arbitration filed by Chevron. (Ex. 14, to the Republic's Mem. of Law in Part. Opp'n.) The declaration, however, does not describe in any detail the points on which the Republic and the Lago Agrio Plaintiffs shared an identical legal interest or the timing or scope the community-of-interest privilege the Republic now asserts. The party asserting a privilege necessarily bears the burden of demonstrating its applicability. See, e.g., United States v. Pinho, No. 02-CR-814, 2003 U.S. Dist. LEXIS 12244 (E.D. Pa. July 8, 2003). The Court concludes the Republic has failed to meet that burden in this case, and that by failing to do so in a timely fashion, the Republic has waived any privilege or work-product protection that might otherwise attach under the community-of-interest doctrine.[2]

---

[2] On December 20, 2010, the Republic submitted a supplemental declaration by Eric Bloom. By Order dated December 14, 2010, the Court stated:

> In the event any party concludes it is appropriate to present additional evidence at [the December 17, 2010 hearing], that party shall notify the Court

As such, the Court will deny the Republic's Motion for In Camera Review.

**IV.    CONCLUSION**

For the reasons stated above, the Court grants the applications of Chevron and Pallares and Veiga. The Court denies the Republic's Motion for In Camera Review or Appointment of a Special Master. An appropriate order follows.

---

and all other counsel by letter to Chambers no later than 5:00 P.M., on December 15, 2010, summarizing such evidence.

The supplemental declaration arrived too late for consideration in this Memorandum, which was completed before the supplemental declaration was filed.